LEAVY, Circuit Judge:
 

 This is a petition for review of an order of the Commodity Futures Trading Commission (CFTC or Commission) issued in a reparations proceeding. The CFTC upheld the decision of its Administrative Law Judge (AU), made after a full hearing, that Wellington Advisory, Inc. and Bert Dohmen-Ramirez, Wellington’s president and owner, were liable for the fraudulent acts of their agent, Jon Handy, under 7 U.S.C. § 4. Handy was found to have violated 7 U.S.C. § 6b, an anti-fraud provision of the Commodity Exchange Act (CEA), by trading the Wellington-managed commodities account of respondent Ronald Ho contrary to promises made by Dohmen-Ra-mirez to Ho, without disclosing this to Ho.
 

 FACTS
 

 Bert Dohmen-Ramirez is the president and owner of Wellington Advisory, Inc. of Honolulu. Both are registered with the CFTC as commodity trading advisors. Ronald Ho is a terminal agent at the Honolulu airport.
 

 Occasionally Dohmen-Ramirez, representing Wellington, conducted seminars for prospective clients. In April 1979, Ho attended his first Wellington seminar. After the seminar, Ho signed up for a one year subscription to the Wellington Letter, an investment advisory letter written by Doh-men-Ramirez.
 

 On July 18, 1979, Ho attended his second Wellington investment seminar, at which Jon Handy was the guest speaker. Doh-men-Ramirez introduced Handy as a professional commodities trader. Handy’s biography was distributed, and Handy presented computer printouts and other documents showing that he performed well as a trader and his accounts showed significant gains.
 

 Handy operated an office on Maui. He was an “associated person” of Murlas Brothers Commodities, Inc., a Chicago-based futures commission merchant. Although Handy never signed an agent agreement with Murlas, he traded his commodities accounts through Murlas. Murlas considered Handy to be a trading advisor, and Murlas adopted Handy’s computerized trading system, called “DataComm.” Ho did not learn at the seminar about the relationship between Handy and Murlas.
 

 At the close of the second seminar, participants were encouraged to call upon the
 
 *851
 
 Wellington office to open a commodities account. Following this suggestion, Ho scheduled an appointment with Dohmen-Ramirez at the Wellington office. Ho testified before the AU that the meeting occurred on July 20, 1979, and that Handy was present. However, Dohmen-Ramirez testified that the meeting took place on July 19, and that Handy was not present, having already returned to Maui.
 

 At the meeting, Ho told Dohmen-Ra-mirez and Handy that he was interested in a long term, conservative approach to the commodities market, not “short term, in and out trading.” Ho testified that Doh-men-Ramirez told Ho that Dohmen-Ra-mirez and Handy were partners, that they would confer on all trades, and that no trade would be made unless both agreed. Dohmen-Ramirez also allegedly told Ho that Handy would be entering the trade orders for Ho’s account.
 

 Ho testified that he informed Dohmen-Ramirez and Handy that he was interested in retaining Wellington as his commodities trading advisor, but that he first wanted to visit Handy’s office “to see what type of operation Handy was running in Maui.” Ho made an appointment at that time to visit Handy the following Monday, July 23. Dohmen-Ramirez and Handy gave Ho some Wellington agreement forms to read over the weekend.
 

 On July 23,1979, Ho visited Handy at his office on Maui and was satisfied with the operation. Ho testified that he again told Handy that he wanted to establish an account with Wellington as his commodities advisor. Since Ho had left his Wellington forms at home, Handy produced the appropriate Wellington forms for Ho to sign. Ho had already read these forms over the weekend. He signed them in Handy’s presence. Handy also produced some Murlas forms. Handy did not explain the purpose of these, but said they were necessary to open the account and instructed Ho to sign them, which Ho did.
 

 He signed the following documents on July 23, 1979, at Handy’s office:
 

 1)Wellington Advisory Agreement, which provided for the deposit of Ho’s funds with the Murlas brokerage firm. It described the nature of Wellington’s advisory authority and specified the fee schedule. The Agreement stated that Wellington would trade Ho’s account “directly or through subcontracted advisors.” Handy also signed this, on behalf of Wellington.
 

 2) Wellington Managed Commodity Account Agreement, which provided that Wellington, as Ho’s advisor, would manage Ho’s trading account at Mur-las. It also provided that Wellington’s fees would be paid automatically out of Ho’s account at Murlas.
 

 3) Murlas Managed Account Authorization, which provided that Handy, as a Murlas trader, was authorized to trade Ho’s account. Handy also signed this, on behalf of Murlas.
 

 4) Murlas Affidavit of Trading Risk Understanding, which warned of the high risks in commodities trading and high commission charges.
 

 On July 25, Ho sent a check for $20,000 to Murlas in Chicago to open his account, with a letter stating that “[a]ll of the necessary papers and trading instructions will by [sic] given to you by Jon Handy of Kula, Maui.”
 

 Ho testified he understood that Murlas was the broker who would enter the trading orders in his account, but that Wellington was his commodities trading advisor. Ho believed that Dohmen-Ramirez and Handy together constituted Wellington, and that they would confer on all trades. Ho did not believe that Handy was a Mur-las broker or associated person. He expected that Handy would be compensated only out of the Wellington management fee, and not from the Murlas commissions.
 

 At Handy’s suggestion, in July 1979, Leroy J. Gordon, the president of Murlas, visited Dohmen-Ramirez to discuss the possibility of the latter operating a Murlas office in Honolulu. Dohmen-Ramirez declined. However, according to Gordon, Handy and Dohmen-Ramirez planned to work out an agreement whereby Dohmen-Ramirez would place some Wellington clients with Handy. Handy would place
 
 *852
 
 the trade orders with Murlas, and Handy and Dohmen-Ramirez would split the commissions and advisory fees. These clients would remain Wellington clients, not Mur-las clients.
 

 On July 24, 1979, Dohmen-Ramirez wrote a letter to Murlas stating that Wellington “will be managing commodity accounts using Mr. Handy as a subcontracted advisor. We intend to place a number of these accounts with Murlas Brothers Commodities because it facilitates Mr. Handy’s work.” He enclosed some Wellington forms for approval and modification, if necessary, by Murlas.
 

 On July 31, 1979, Murlas replied to Doh-men-Ramirez. Murlas found one Wellington form, the trading advisor disclosure form, to be unacceptable, and provided an acceptable form. Murlas advised Dohmen-Ramirez that his accounts with them could not be traded until the new disclosure forms were sent to his clients. Dohmen-Ramirez sent this new form to two Wellington clients whom he had already placed with Handy. However, he did not at that time send the new form to Ho. The Murlas letter also advised Dohmen-Ramirez that his relationship with Murlas was not yet final, but that Handy or another Murlas representative would be contacting him about it shortly.
 

 Approximately one week after Ho opened his account, he began receiving trade confirmation statements. He immediately noticed that the trading appeared to be excessive and the trades were short term, contrary to his understanding with Dohmen-Ramirez and the Wellington letter recommendations. The commissions were higher than those described at Dohmen-Ramirez’ investment seminar. The account statements revealed that Ho was experiencing trading losses.
 

 Because Ho viewed his account as a Wellington-managed account, he quickly scheduled a meeting with Dohmen-Ra-mirez, on August 7, to complain about the handling of it. At the meeting, Ho learned that contrary to his understanding, Handy had not consulted with Dohmen-Ramirez concerning the trades in Ho’s account. Ho had to provide Dohmen-Ramirez with copies of his trade confirmation statements.
 

 Dohmen-Ramirez testified to a different version of this meeting. He testified that Ho scheduled the meeting to request help from Dohmen-Ramirez, because Ho had independently established his own account with Murlas through Handy. Contrary to Ho’s impression, Dohmen-Ramirez claims that it was at this time that Ho first asked him to become involved with Ho’s account, but that he agreed only to look into the matter.
 

 They agree that at the August 7 meeting, Dohmen-Ramirez counseled Ho to be patient, explaining that commodities accounts sometimes start out with losses but become profitable. Ho testified that Doh-men-Ramirez never said anything to indicate that Handy lacked authority to open a Wellington account for Ho. He also testified that Dohmen-Ramirez told him he would contact Handy to reduce the number of transactions and emphasize different trading areas.
 

 Ho’s account statements continued to reflect a high level of trading, large commissions, and growing losses. On August 16, Dohmen-Ramirez sent Ho a Wellington disclosure document of the type approved by Murlas. Ho signed it when he returned to Dohmen-Ramirez’ office on August 20, to complain about the continued problems with his account. Dohmen-Ramirez does not remember this meeting.
 

 Ho testified that at this meeting, Doh-men-Ramirez again claimed he had no knowledge of the activity in Ho’s account, and had not been consulted by Handy. Dohmen-Ramirez did not dispute this, because he testified that he did not view Ho as a Wellington client until the disclosure document was signed. The disclosure document stated that Wellington “employs outside, experienced commodity traders who actually initiate transactions in client’s commodity accounts, but, as always in accordance with the philosophy of the firm.” Ho testified that Dohmen-Ramirez was concerned about Ho’s losses, and again said he would try to reduce the level of activity and emphasize other commodities.
 

 
 *853
 
 On August 21, 1979, Dohmen-Ramirez sent two letters to Handy. The first one was captioned “Trading Policy for Wellington’s Clients” and set forth specific trading policies that Dohmen-Ramirez had already discussed orally with Handy. The second letter was “to confirm what we have already discussed in person regarding the account of Mr. Ronald Ho.” Dohmen-Ra-mirez gave specific instructions for the handling of Ho’s account. The letter did not indicate that Handy lacked authority to open a Wellington-managed account for Ho.
 

 However, the losses continued, trading was still excessive, and several trades were contrary to the Wellington trading policies. Dohmen-Ramirez testified that during this time he spoke regularly with Handy on the phone concerning Ho’s account, he received the trade confirmation statements, and he met with Handy to discuss discrepancies between Dohmen-Ramirez’ trading instructions and the trades actually made by Handy.
 

 Because there appeared to be no change in the way his account was being handled, Ho again met with Dohmen-Ramirez, on September 10,1979. Contrary to Dohmen-Ramirez’ testimony, Ho claims that Doh-men-Ramirez still seemed uninformed about Ho’s account, and that Ho had to provide him with copies of his trading confirmation statements. At this time Doh-men-Ramirez called Gordon at Murlas and closed out all the Wellington-managed accounts at Murlas, including Ho’s. By this time, Ho had lost the entire $20,000 he had invested. Dohmen-Ramirez followed up this conversation with a letter to Murlas explaining how Handy had violated the Wellington trading policies. Dohmen-Ra-mirez wrote that he was waiving his customary fee, and suggested that Murlas credit Ho’s account with the commissions Handy would normally receive and reimburse Ho for losses in trades that went against the Wellington policies.
 

 PROCEEDINGS BEFORE THE ADMINISTRATIVE LAW JUDGE
 

 On July 28, 1980, Ho filed a reparations complaint with the Commodity Futures Trading Commission naming Dohmen-Ra-mirez, Wellington, Handy, and Murlas. Ho alleged that the respondents fraudulently induced him to enter into his Wellington-managed account, “churned” the account, mismanaged his funds, and engaged in unauthorized trading, in violation of the Commodities Exchange Act (CEA), 7 U.S.C. §§ 6b, 6o, and 6d, and various CFTC regulations. He sought reparations in the amount of his $20,000 investment and brokerage commissions of $2,764.
 

 Dohmen-Ramirez and Wellington filed an answer and a separate document entitled “Claim ... Against Respondents Jon Handy and Murlas Commodities, Inc.” in which they contend that to the extent they are found liable to Ho, Handy and Murlas are “jointly and severally liable” to Doh-men-Ramirez and Wellington for the entire amount. Murlas filed an answer to this claim.
 

 On September 8,1982, the administrative law judge (AU) stayed the proceeding with respect to Handy, because the latter had filed a bankruptcy petition in federal district court. Subsequently, Ho settled with Murlas for $5,563 and Murlas was dismissed from the case.
 

 The AU held an evidentiary hearing on the claims against Dohmen-Ramirez and Wellington on August 13, 1984, at which Ho, Dohmen-Ramirez, and Gordon testified.
 

 The AU found that Dohmen-Ramirez and Wellington violated section 4o of the CEA, 7 U.S.C. § 6o,
 
 [1]
 
 on two grounds.
 
 *854
 
 First, the AU held that Handy was acting as the agent of Dohmen-Ramirez and Wellington, and that they were therefore liable for Handy’s fraudulent acts under section 2(a)(1)) of the CEA, 7 U.S.C. § 4.
 
 [2]
 
 Second, the AU concluded that Dohmen-Ramirez and Wellington had directly violated 7 U.S. C. § 6o, by not following their represented trading principles. The AU did not discuss the cross-claim against Murías and Handy, nor did he issue a formal ruling on it.
 

 In his written decision, the AU stated that his findings of fact and conclusion of law were based upon the entire record and his observation of the witnesses at the hearing. Accordingly, the AU resolved the apparent conflicts between the testimony of Ho and Dohmen-Ramirez in favor of Ho. In explaining why he did so, the AU cited extensively from the documentary and testimonial evidence before him, as shown by the following key portions of the AU’s decision:
 

 It seems to me that the Ramirez version of these events cannot be squared with the documents signed by complainant on July 23,1979. If complainant had gone to Handy’s office to deal with him to the exclusion of Ramirez (and Wellington), he would not have signed documents to do business with Wellington; these documents imposed on complainant the obligation to pay substantial management fees to Wellington. Nor would Handy have requested that such documents be signed providing for payments to Wellington if Wellington was not to be involved.
 

 Though this does not completely answer the questions of whether Handy was present at the meeting between Ramirez and complainant, and what was said about him, complainant’s averments that he made the appointment to see Handy later in Maui during the Ramirez meeting, that he went to the meeting on Maui, and while there, signed the described Wellington documents, is entirely consistent with his version of the Ramirez meeting. There is virtually nothing to support Ramirez’s assertions, except his word.
 

 As indicated, Ramirez on July 24,1979, described Handy as a “subcontractor ad-visor” of his firm. Prior to this, beginning in April 1979, complainant had become a follower of Ramirez, convinced of the soundness of his advice. He met Handy at a meeting conducted by Ramirez, and within a day or two signed the Wellington documents in Handy’s office. Although Ramriez [sic] denies that he referred to Handy as his “partner,” in view of the written statement that Handy was a “subcontractor advisor,” it is entirely plausible that he made statements that led complainant to believe that Handy had authority to act for Wellington and Ramirez. If Handy were [sic] their subcontractor, then they were primarily liable for his acts. Since Handy had possession of Wellington forms, complainant, by signing those forms, could reasonably conclude that he thereby became a customer of Wellington.
 

 The AU discussed at length the factual reasons for his conclusion that Handy was the agent of Dohmen-Ramirez and Wellington from the time Ho first opened his account with Handy. He pointed to the arrangement that Handy and Dohmen-Ra-mirez had established for the mutual advising of customers before Ho’s investment; the regular telephone conversations between the two; Dohmen-Ramirez’ apparent acceptance of, if not actual knowledge of the existence of, Wellington documents signed by Ho in Handy’s presence; Doh-men-Ramirez’ August 21 letter giving specific instructions to Handy regarding how to handle Ho’s account; Dohmen-Ramirez’ description of Handy as a “subcontractor advisor” in Wellington documents; and
 
 *855
 
 Dohmen-Ramirez’ actions after August 7 as being consistent with his actions prior to then, which reasonably led Ho to believe that Handy was his agent.
 

 The AU also refuted the various arguments of Dohmen-Ramirez and Wellington. The AU held that even if Handy was an agent of Murlas, that did not preclude Handy also being an agent of the petitioners. He found there was a sufficient causal connection between Ho’s loss and his claims against petitioners. The AU also found that Ho did not ratify Handy’s trading, but rather objected to it from the outset. Finally, the AU found that the petitioners were liable for Ho’s losses prior to his signing of the Wellington risk disclosure documents, given the petitioners’ relationship to Handy from the start.
 

 On July 31, 1985, the AU ordered Doh-men-Ramirez and Wellington to pay Ho reparations of $13,942 (reflecting the Mur-las settlement and a commission adjustment), plus interest and filing costs.
 

 PROCEEDINGS BEFORE THE COMMISSION
 

 Dohmen-Ramirez and Wellington appealed the AU’s decision to the Commodity Futures Trading Commission. The Commission initially affirmed the AU on both grounds on which the AU relied. However, on November 21, 1986, the Commission vacated that order and entered a second one, in which it affirmed the AU’s decision solely on the ground that Handy was acting as the agent of Dohmen-Ra-mirez and Wellington when he defrauded Ho.
 

 In its opinion, the Commission noted that its “appellate function does not generally involve retrying factual conflicts resolved by the presiding officer[,] ... especially so ... where ... the Judge based his findings in part on ‘my observation of the witnesses at the hearing.’ ” Nonetheless, the Commission explained at length why the facts “clearly support the Judge’s conclusion that a principal-agent relationship existed between Handy and [Dohmen-Ramirez and Wellington].” The Commission then described those actions of Handy that violated section 4b of the CEA, 7 U.S.C. § 6b.
 

 The Commission rejected the petitioners’ contention that damages should be apportioned on the basis of fault or under the Uniform Contribution Among Tortfeasors Act, because the petitioners failed to present these contentions before the AU. On the merits of this contention, the Commission found that the acts of Murlas and Handy did not break the causal connection between Handy’s fraudulent inducement as petitioners’ agent and Ho’s losses.
 

 Finally, the Commission found that it was under no obligation to hear petitioners’ cross-claim, as it is not provided for in the CFTC regulations and would thwart the purpose of the reparations system to provide speedy relief.
 

 The petitioners timely appealed the Commission’s decision.
 

 CONTENTIONS ON APPEAL
 

 The petitioners raise the following issues on appeal. Generally, they reargue the facts, and inferences drawn from those facts, as found by the AU and Commission.
 

 (1) The Commission applied the wrong standard of review to the AU’s decision. They claim the Commission should have undertaken a fact-finding process of its own, but it instead adopted “by rote” the factual findings of the AU.
 

 (2) The evidence fails to support the conclusion that Handy was the agent of Dohmen-Ramirez and Wellington.
 

 (3) The Commission’s opinion does not support its holding that Handy violated section 4b of the CEA, 7 U.S.C. § 6b, because no willful intent to defraud on Handy’s part was shown.
 

 (4) There was not a causal link between Ho’s losses and Handy’s actions.
 

 (5) Only Wellington, not Dohmen-Ra-mirez, should be held liable for Handy’s actions.
 

 (6) Ho’s discovery that Handy was trading his account contrary to Ho’s expectations and without consulting Dohmen-Ramirez bars Ho from recovering any
 
 *856
 
 losses incurred after this discovery, because he had notice of Handy’s actions. (7) The AU and Commission should have heard the petitioners’ cross-claim against Murlas and Handy in the reparations proceeding and, if not, damages should have been apportioned according to fault.
 

 The respondents refute these contentions. In addition, Ho seeks attorney’s fees and double costs pursuant to Federal Rule of Appellate Procedure 38, on the grounds that the petitioners have filed this appeal frivolously and in bad faith.
 

 STANDARD OF REVIEW BY COURT OF APPEALS OF AGENCY DECISIONS
 

 On appeal, the factual findings of the Commission are conclusive “if supported by the weight of evidence.” 7 U.S. C. § 9,
 
 as incorporated by reference in
 
 7 U.S.C. § 18(e).
 
 See Clayton Brokerage Co. of St. Louis, Inc. v. Bunzel,
 
 820 F.2d 1459, 1461 (9th Cir.1987). Courts, including the Ninth Circuit, have interpreted “weight of evidence” to mean “the preponderance” of the evidence.
 
 First Nat’l Monetary Corp. v. Weinberger,
 
 819 F.2d 1334, 1338-39 (6th Cir.1987);
 
 Premex, Inc. v. CFTC,
 
 785 F.2d 1403, 1407 n. 11 (9th Cir.1986);
 
 Lawrence v. CFTC,
 
 759 F.2d 767, 773 (9th Cir.1985).
 

 The Court of Appeals for the Seventh Circuit recently explained this standard:
 

 Our role in reviewing CFTC reparation orders is extremely narrow.... The function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction it “preponderates”; it is rather to review the record for the purpose of determining whether the finder of fact — here the AU — was justified.
 

 Chapman v. CFTC,
 
 788 F.2d 408, 410 (7th Cir.1986) (citations omitted).
 
 Accord Weinberger,
 
 819 F.2d at 1338-39;
 
 Haltmier v. CFTC,
 
 554 F.2d 556, 560 (2d Cir.1977).
 

 Moreover, credibility determinations made by an AU are given great deference and upheld “unless they are ‘inherently incredible or patently unreasonable.’ ”
 
 Photo-Sonics, Inc. v. NLRB,
 
 678 F.2d 121, 123 (9th Cir.1982) (quoting
 
 NLRB v. Anthony Co.,
 
 557 F.2d 692, 695 (9th Cir.1977)).
 
 Accord Weinberger,
 
 819 F.2d at 1339. This is because the AU has the opportunity to observe the witnesses’ demeanors.
 
 Weinberger,
 
 819 F.2d at 1339;
 
 Photo-Sonics,
 
 678 F.2d at 123.
 

 STANDARD OF REVIEW BY CFTC OF AU’S DECISION
 

 An agency board must evaluate whether substantial evidence, looking at the record as a whole, supports the fact-finder’s conclusions.
 
 Universal Camera Corp. v. NLRB,
 
 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This standard does not detract from the significance that should be accorded the fact-finder’s conclusions when issues of credibility are central to the case, since the fact-finder has the opportunity to observe the witnesses and the board does not. The Commission does not review de novo factual findings made by the AU.
 
 Cohen v. Manganiello,
 
 [Current] Comm.Fut.L.Rep. (CCH) ¶ 23,346 at 32,955 (CFTC 1986).
 

 DISCUSSION
 

 A. Commission Review of AU’s Decision
 

 Contrary to petitioners’ assertion, the Commission is under no obligation to undertake its own fact-finding process in reviewing the AU’s decision. The Commission’s written opinion demonstrates that it adequately scrutinized the AU’s findings to determine if they were supported by substantial evidence in the record as a whole.
 

 The Commission stated that it reviewed the record before the AU in reaching its decision. The Commission acknowledged that it generally defers to the AU’s findings of fact, especially when each side gives different versions of the same events, as here, and only the AU has the opportunity to observe the witnesses. Nonetheless, the Commission went on to examine the facts for itself, and, citing both testimonial and documentary evidence, con-
 
 *857
 
 eluded that “the facts in this case clearly support the Judge’s conclusion that a principal-agent relationship existed between Handy and [Dohmen-Ramirez and Wellington].” The Commission did not, as petitioners contend, blindly defer to the AU.
 

 The Commission’s opinion demonstrates that it looked at the entire record and found substantial evidence to support the AU’s factual determinations. A higher level of scrutiny is not required. The petitioners’ contention is without merit.
 

 B. Whether the Weight of the Evidence Supports the Commission’s Findings
 

 1.
 
 Whether Handy Committed Statutory Commodities Fraud
 

 The Commission found that Handy violated section 4b of the CEA, 7 U.S.C. § 6b, “by trading Ho’s account in utter disregard of trading policies he knew [Ho] expected would guide the trading of his account.”
 

 Section 4b makes it unlawful, among other things, “for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery ... for or on behalf of any other person ... to cheat or defraud or attempt to cheat or defraud such other person.” 7 U.S.C. § 6b. The Commission correctly found that substantial evidence in the record as a whole supported the AU’s factual findings leading to the conclusion that Handy defrauded Ho.
 

 The AU carefully analyzed Ho’s and Dohmen-Ramirez’ versions of their first meeting, and found Ho’s testimony that Handy was present at this meeting to be credible. Given that Handy was present, the Commission found that Handy knew that Ho contemplated establishing a Wellington account that would be managed conservatively according to Wellington’s very specific policies. Handy also knew that Ho expected Handy and Dohmen-Ramirez to consult on each trade. Only a few days later at Handy’s office, Ho again discussed with Handy his desire to establish a Wellington account. Handy provided Ho with forms to set up a Wellington account. Ample evidence supports the Commission’s findings that Handy knew how Ho wished to have his account managed, and no evidence to the contrary exists.
 

 Almost immediately, Handy began trading Ho’s account contrary to the Wellington principles. Handy continued to do so despite several letters and phone calls from Dohmen-Ramirez explaining that Handy was not handling the account as Ho had expected and instructing Handy how correctly to handle the account. The Commission noted that no evidence exists that Handy ever attempted to trade Ho’s account according to the Wellington principles, or to disclose to Ho that he did not consider himself bound by Dohmen-Ra-mirez’ representations. Thus, looking at all the evidence in the record, the Commission reasonably inferred that Handy never intended to follow the Wellington principles as he led Ho to believe he would.
 

 Such intentional conduct is sufficient to establish a violation of section 4b of the CEA. Contrary to petitioners’ contention, it is not necessary that an evil motive or scienter on the part of Handy be established.
 
 Cange v. Stotler & Co., Inc.,
 
 826 F.2d 581, 589 (7th Cir.1987);
 
 CFTC v. Savage,
 
 611 F.2d 270, 283-85 (9th Cir.1979).
 

 Substantial evidence in the record as a whole supports the Commission’s finding that Handy violated section 4b of the CEA. On review by this court, the Commission’s finding is supported by the weight of the evidence.
 

 2.
 
 Whether a Principal-Agent Relationship Existed Between Handy and Dohmen-Ramirez and Wellington
 

 Under section 2(a)(1) of the CEA, 7 U.S.C. § 4, if Handy was acting as the agent of Dohmen-Ramirez and Wellington when he defrauded Ho, then Dohmen-Ra-mirez and Wellington are liable.
 

 The Ninth Circuit has yet to determine the relationship between the common law doctrine of respondeat superior liability and liability under section 2(a)(1). However, the Seventh Circuit has held that section 2(a)(1)) imposes strict liability, under a re-
 
 *858
 
 spondeat superior theory, on principals for the actions of their agents.
 
 Rosenthal & Co. v. CFTC,
 
 802 F.2d 963, 966 (7th Cir.1986). This liability is imposed even if the agents are not employees, if the principal authorizes or ratifies the acts or even just creates the appearance that the acts are authorized.
 
 Id.
 

 We agree with the reasoning of the Seventh Circuit that because the language of section 2(a)(1) expressly imputes the agent’s wrongdoing to the principal, it imposes strict liability.
 

 The Seventh Circuit has provided guidance in reviewing a Commission finding of agency: “Some deference must be paid to the special knowledge which the Commission brings to the regulation of the commodities markets. The ascription of agency is a purposive, policy-oriented act rather than an exercise in semantics.”
 
 Id.
 
 at 969.
 

 Central to the Commission’s determination that an agency relationship existed was the ALJ’s finding that Handy was present at Ho’s first meeting with Dohmen-Ramirez, at which Dohmen-Ramirez introduced Handy as his “partner.” Because Ho and Dohmen-Ramirez differed in their accounts of this meeting, deference is properly given to the AU’s findings of credibility. The AU found Ho’s testimony to be credible, and found that it was supported by later events and documentary evidence. The AU pointed out that nothing supported Dohmen-Ramirez’ version, except his word.
 

 The Commission found additional support for its finding of an agency relationship in other testimonial and documentary evidence. It pointed to the July 24, 1979, letter written by Dohmen-Ramirez to Mur-las in which he stated that Wellington was using Handy as a subcontracted advisor and that they had agreed on a particular trading program for accounts like Ho’s. The Commission also found support in the phone calls between Dohmen-Ramirez and Handy, in Dohmen-Ramirez’ correspondence with Murlas, and in Handy’s possession of Wellington forms.
 

 The Commission specifically looked at the facts which the petitioners claimed were inconsistent with an agency relationship, and found petitioners’ arguments unpersuasive. The petitioners claimed that the July 31, 1979 letter from Murlas stating that Dohmen-Ramirez’ customers would have to complete new disclosure documents before their Wellington accounts could be traded through Murlas established that an agency relationship did not exist between Handy and Dohmen-Ramirez and Wellington. However, this letter merely shows that a formal relationship between Dohmen-Ramirez and Murlas was not yet final. It does not detract from the Commission’s finding that Dohmen-Ramirez and Handy had already established a business relationship regarding Ho’s account or other individual Wellington accounts. Doh-men-Ramirez and Wellington conceded they had already established such a relationship with Handy concerning two other accounts.
 

 The Commission agreed with the AU in discrediting Dohmen-Ramirez’ speculation that Handy possessed Wellington forms because he picked up ones that were left lying around at the seminar. Rather, the Commission found that Handy’s possession of Wellington forms was another indication of an agency relationship.
 

 The Commission properly rejected the petitioners’ contention that an agency relationship was lacking because Dohmen-Ramirez did not control Handy and Handy may have acted without the consent or knowledge of Dohmen-Ramirez. It is not necessary to show control to establish agency under the CEA. As pointed out by the Seventh Circuit, agency under the CEA is premised on respondeat superior liability, and it is not necessary that the principal direct the act or have knowledge of the agent’s actions.
 
 Cange,
 
 826 F.2d at 589;
 
 Rosenthal,
 
 802 F.2d at 966.
 

 Finally, the Commission properly rejected the petitioners’ argument that an agency relationship was lacking because only Handy and Murlas stood to profit from the trading of Ho’s account. That the principal may not have benefited from the agent’s fraud does not preclude a find
 
 *859
 
 ing that the agent was acting within the scope of his agency.
 
 Cange,
 
 826 F.2d at 589;
 
 Rosenthal,
 
 802 F.2d at 969.
 

 Substantial evidence in the record as a whole supports the Commission’s finding that a principal-agent relationship existed between Dohmen-Ramirez and Wellington and Handy. On review by this court, the Commission’s finding is supported by the weight of the evidence.
 

 3.
 
 Whether There Was a Causal Link Between Ho’s Losses and Handy’s Actions
 

 The AU and the Commission found that Ho invested his money with Handy based on the misrepresentations of Handy and Dohmen-Ramirez that Ho’s account would be traded according to the Wellington principles and based on consultation between Handy and Dohmen-Ramirez. The AU and the Commission also believed Ho’s testimony that he would not have invested his money if he had known that the Wellington trading guidelines would not be followed. When trading is premised on the customer’s reliance on the broker’s misrepresentations, “the broker will be liable for losses resulting therefrom.”
 
 Clayton Brokerage v. Commodity Futures Trading Commission,
 
 794 F.2d 573, 579 (11th Cir.1986).
 
 See Hall v. Paine Webber Jackson & Curtis, Inc.,
 
 [Current] Comm.Fut.L.Rep. (CCH) ¶ 23,317 at 32,889 (CFTC 1986).
 

 Thus, the Commission properly found a sufficient causal link between Handy’s misrepresentations to Ho and Ho’s losses.
 

 C.Whether Only Wellington, and Not Dohmen-Ramirez, Should be Held Liable for Handy’s Actions
 

 In their appeal, petitioners raise for the first time the contention that any derivative liability for Handy’s actions should run only to Wellington, not to Doh-men-Ramirez, because Dohmen-Ramirez is not the “legal person” with whom Ho could contract.
 

 Because petitioners did not raise this argument before the Commission, it is disregarded on appeal.
 
 United States v. Tucker Truck Dines, Inc.,
 
 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952);
 
 Pierce County v. United States,
 
 699 F.2d 1001, 1005 (9th Cir.1983). Neither the AU nor the Commission had the opportunity to evaluate whether Dohmen-Ramirez was the alter ego of Wellington and therefore should be held liable for Handy’s fraud to the same extent as Wellington.
 

 D. Whether Ho Should be Estopped from Claiming Damages Incurred After Ho Learned of Handy’s Actions
 

 The petitioners argue, again for the first time, that Ho should be estopped from recovering damages incurred after he became aware of Handy’s improper trading of his account, which he knew of by at least August 7, 1979.
 

 Because the petitioners did not raise this argument below, it is disregarded on appeal.
 
 Tucker Truck Lines,
 
 344 U.S. at 37, 73 S.Ct. at 69;
 
 Pierce County,
 
 699 F.2d at 1005. Moreover, the argument lacks merit. The testimony of both Ho and Dohmen-Ramirez shows that Ho relied on continuing misrepresentations and assurances made by Dohmen-Ramirez that Ho’s investment would eventually show a profit. This is sufficient to preclude Ho from being estopped from recovering damages after he first learned of Handy’s activities.
 
 Clayton Brokerage,
 
 794 F.2d at 578-81;
 
 Stoller v. Siegel Trading Co.,
 
 [1984-1986] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,209 (CFTC 1984).
 
 See Cange,
 
 826 F.2d at 591.
 

 E. Whether the AU and Commission Should Have Heard the Petitioners’ Cross-Claim or Apportioned Damages
 

 The AU did not discuss the petitioners’ cross-claim against Murías and Handy, and the Commission refused to entertain it because such third party practice delays and complicates reparations proceedings.
 

 The CEA charges the CFTC with the administration of a reparations procedure by which disgruntled customers of professional commodities brokers can seek redress for the brokers’ violations of the CEA or the CFTC regulations. 7 U.S.C.
 
 *860
 
 § 18. The CEA provides that “[t]he Commission may promulgate such rules, regulations and orders as it deems necessary or appropriate for the efficient and expeditious administration of this section.” 7 U.S.C. § 18(b). The Supreme Court has recognized that “Congress intended this administrative procedure to be an ‘inexpensive and expeditious’ alternative to existing fora available to aggrieved customers, namely, the courts and arbitration.”
 
 CFTC v. Schor,
 
 478 U.S. 833, 106 S.Ct. 3245, 3250, 92 L.Ed.2d 675 (1986) (quoting S.Rep. No. 850, 95th Cong.2d Sess. 11,
 
 reprinted in
 
 1978 U.S. Code Cong. & Admin. News 2087, 2099).
 

 The Commission considered the cross-claim issue when it revised its reparations rules in 1984, and concluded:
 

 “[T]he adoption of third party practice would frustrate Congress’ goal of making reparations a more simplified and expeditious procedure.
 

 From the decisionmaking perspective, the allowance of third party claims would delay recovery to complainants unnecessarily in cases where the issue of the liability of at least one of the respondents to the complainant could be resolved simply and readily, but the added question of liability as between corespondents involves complicated factual or legal issues requiring a much greater commitment of time for resolution.
 

 49 Fed.Reg. 6602, 6605 (Feb. 22, 1984).
 

 Neither the courts nor Congress has suggested that the Commission’s reparations procedure, which is designed to help aggrieved customers, is also required to resolve disputes among professional brokers found liable. Contrary to petitioners’ assertions,
 
 Schor
 
 does not require the Commission to consider cross-claims.
 

 The Supreme Court in
 
 Schor
 
 held that the CEA empowers the CFTC to entertain state law counterclaims in reparations proceedings.
 
 Schor,
 
 106 S.Ct. at 3252-53. The Court recognized that otherwise, an aggrieved commodities customer would “normally be compelled either by compulsory counterclaim rules or by the expense of litigating the same issues in two fora to forgo his reparations remedy and to litigate his claim in court.”
 
 Id.
 
 at 3254. The Commission’s refusal to entertain cross-claims between liable brokers in a reparations proceeding will not similarly harm the aggrieved customer. Rather, entertainment of such cross-claims may injure the customer by delaying and complicating the proceedings. As the Commission here noted, “Dohmen-Ramirez and Wellington are free to raise their claims against Murlas and Handy before other, more appropriate tribunals.” Thus, the Commission properly refused to entertain the petitioners’ cross-claim.
 

 The petitioners argue alternatively that the Commission should have apportioned damages under the Uniform Contribution Among Tortfeasors Act, which has been adopted by Hawaii. Haw.Rev. Stat. § 663-12 (1985). As the Commission pointed out, the petitioners failed to raise this argument before the AU, and therefore cannot argue it on appeal.
 
 Tucker Truck Lines,
 
 334 U.S. at 37, 73 S.Ct. at 69. Also, adopting a comparative fault system in reparations proceedings would frustrate the purposes of the proceedings in the same way entertaining cross-claims would. Moreover, the petitioners were found liable on a respondeat superior theory. As the Seventh Circuit stated, a principal can be held fully liable for the fraudulent act of his agent even though “the principal does not himself direct the act and may indeed know nothing about it when it occurs.”
 
 Rosenthal,
 
 802 F.2d at 966.
 
 See Cange,
 
 826 F.2d at 589.
 

 The Commission properly refused to entertain this contention because the petitioners failed to raise it before the AU. Moreover, the contention is without merit.
 

 F. Attorneys Fees and Double Costs
 

 Federal Rule of Appellate Procedure 38 provides that if the court of appeals determines an appeal is frivolous, it may award “just damages and single or double costs to the appellee.” It is within the court’s discretion to award damages
 
 *861
 
 “as a matter of justice to the appellee and as a penalty against the appellant.” Notes of Advisory Comm, on Appellate Rules.
 

 The factual findings of the Commission are overwhelmingly supported by the evidence. We find this appeal to be frivolous and harassing, and award attorney’s fees and double costs to respondent Ho.
 

 CONCLUSION
 

 The decision of the Commission is AFFIRMED.
 

 [1]
 

 . 7 U.S.C. §
 
 6o
 
 states in part:
 

 (1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate com-mferce, directly or indirectly—
 

 (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
 

 (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.
 

 [2]
 

 . 7 U.S.C. § 4 states:
 

 For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust, as well as of such official, agent, or other person.