**Ronald P. HLAVINKA, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 87–2652.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 15, 1988.
Decided Feb. 6, 1989.

---

Jimmie G. Davison, Milwaukee, Wis., for petitioner.

James Curt Bohling, Commodity Futures Trading Com'n, Washington, D.C., for respondent.

Before CUMMINGS, WOOD, Jr., and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

Petitioner Ronald P. Hlavinka seeks this Court's review of the Commodity Futures Trading Commission (CFTC) order affirming an Administrative Law Judge's denial of his reparations action against futures commission merchant Blunt, Ellis & Loewi, Inc. (Blunt Ellis) and its agents for losses he and his wife incurred in trading silver futures contracts. We deny Hlavinka's petition for review.

## I.

### Facts

In 1980, Hlavinka opened a non-discretionary commodity futures trading account with Blunt Ellis, a registered futures commission merchant in Milwaukee, Wisconsin. In doing so, Hlavinka signed a customer risk disclosure statement as required under the CFTC's Rules. See 17 C.F.R. § 1.55. During the next year, he traded futures contracts and silver bullion. He discontinued trading in October 1981 but retained his account with Blunt Ellis. After the account executive who had been assigned to Hlavinka's account left Blunt Ellis in 1982, another of its employees, John Fromm, contacted Hlavinka to interest him in resuming his investments. As a result, he began trading again in August 1982.

In late 1982, Hlavinka expressed interest in trading 5000–ounce silver futures contracts. These contracts were traded on the Commodity Exchange (COMEX) in New York.[1] Fromm did not recommend this strategy but agreed to process Hlavinka's orders.[2] On January 10, 1983, Hlavinka purchased his first 5000–ounce COMEX silver futures contract. As of February 14, 1983, Hlavinka had profitably completed six additional trades.

On Friday, February 18, 1983, Hlavinka established a new position in the 5000–ounce contract market by entering a "limit" order for one "long" May 1983 contract.[3] This order was filled at a price of

---

1. Until then, Hlavinka's investment in silver futures had been confined to the 1000–ounce contracts available on the Chicago Board of Trade.

2. Blunt Ellis was not a member of COMEX. The firm hired ACLI International, Inc. (ACLI), a COMEX member, to fill its trading orders.

3. A limit order is one "in which the customer sets a limit on either price or time of execution, or both, as contrasted with a market order which implies that the order should be filled at the most favorable price as soon as possible." A long contract is defined as: "(1) One who has bought a futures contract to establish a market position; (2) A market position which obligates

$14.84 per ounce. The market was closed on the following Monday due to President's Day. Significantly, the market opened on Tuesday, February 22, at a lower price than the previous Friday's closing price. Under COMEX rules, the price of a given commodity can only fluctuate within a certain range in one trading day; for silver futures, the limit was then set at 50 cents.[4] By Tuesday's end, the market closed at the lower limit allowed under COMEX rules, or 50 cents down.

On Wednesday, February 23, the market opened in a "locked"[5] position, an indication that the market price of the silver was still declining. Hlavinka's wife (with his consent) entered a limit order to purchase one long May 1983 contract at $13.81 or better, and this order was filled.[6] Hlavinka and his wife now held two long May 1983 5000-ounce silver futures contracts. At the end of trading on February 23, the market had closed down 50 cents for the second consecutive trading day.

On February 24, 1983, Blunt Ellis received an opening call report from its CO-MEX agent, ACLI, listing the day's expected price movement limits for each COMEX contract. The ACLI report erroneously stated that the maximum price movement limit for a COMEX 5000-ounce silver futures contract would be 50 cents. In fact, the limit for the day was 75 cents.[7]

In a telephone conference on February 24, Hlavinka and Fromm decided to liquidate one of the Hlavinkas' two long positions at a price of $13.91. Fromm placed the limit order seven minutes before the COMEX market closed. However, the order was not executed because the market price did not reach $13.91 during the remaining time. The order expired at the end of the market day and, as a result, the Hlavinkas retained both contracts.

In its opening call report for Friday, February 25, 1983, ACLI again incorrectly reported to Blunt Ellis that the price movement limit for the day would be 50 cents. As the market opened, the market price for silver futures remained relatively stable. However, the price later dropped sharply at about the time Mary Hlavinka, petitioner's wife, called Fromm for a price report. When Fromm informed her that the price had dropped 52 cents from the opening quote, she questioned how this could have happened. Fromm was also troubled by the news, since he had understood that there was a 50-cent limit for the day. Fromm contacted ACLI and learned of the 75-cent expanded limit rule. When Fromm telephoned Mr. Hlavinka to explain the expanded price limit situation, he placed a market order to liquidate both his and Mary's contracts.[8] This order was not filled, however, since the market had already locked at the down limit price.

ACLI's opening call report for the next trading day (on Monday, February 28), correctly reflected a price movement limit of $1.00. At 8:45 in the morning (C.S.T.),

---

the holder to take delivery; (3) One who owns an inventory of commodities." Glossary to S.Rep. No. 850, 95th Cong., 2d Sess. 130, reprinted in 1978 U.S.Code Cong. & Admin.News 2087, 2167. "[A] price increase would produce a gain for a 'long' speculator who had acquired a contract to purchase the same commodity with no intent to take delivery but merely for the purpose of reselling the futures contract at an enhanced price." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357-358, 102 S.Ct. 1825, 1828-1829, 72 L.Ed.2d 182.

**4.** "The upper and lower limits ... placed upon price movements in any given day for individual futures contracts serve to cool off hectic markets where prices might otherwise overreact to incomplete or inaccurate market information." 1 P. Johnson, *Commodities Regulation* § 2.20, at 244 (1982).

**5.** A "locked" position occurs when the market reaches the permitted up or down day's limit.

**6.** Fromm marked this order as "unsolicited."

**7.** This larger limit was due to a COMEX rule which provides that if the market closed at the maximum allowable limit for two consecutive trading days (as occurred on February 22 and 23), the price limit would expand to 150% of the normal limit. Should the trend continue and the market continue to expand, the rule specified that the limit would then extend to 200% of the original amount, or $1.00. This rule is designed to alleviate the locked market situation.

**8.** The order was time-stamped 1:15 p.m. (C.S.T.). The ALJ reported that the market locked down the limit at about 1:07 p.m. (C.S.T.).

Hlavinka placed a market order to sell both contracts, an order which remained unfilled since the market opened in a locked position and remained that way throughout the entire day. On Tuesday, March 1, Hlavinka placed a market order to liquidate the contract he acquired on February 18. Mrs. Hlavinka held onto the other contract in the belief that the market would be "corrected." Hlavinka's sell order was filled. Later on the same day, he directed Fromm to liquidate the second contract. By the time this order was placed, the market had already locked down. The second sell order was eventually filled the next day, March 2, at a price of $10.83.

The Hlavinkas lost $35,184.60 in trading the two contracts. He lost an additional $281.06 in trading a 1000-ounce silver contract on March 7, 1983. On December 2, 1983, he initiated a reparations action under Section 14 of the Commodity Exchange Act (CEA), codified at 7 U.S.C. § 18, against Blunt Ellis, Peter J. Pfeffer (Fromm's supervisor), and Fromm for damages. He asserted that the broker and its agents knew or should have known about the expanded limit rule, and that the failure to disclose this information caused him to suffer substantial losses. Specifically, Hlavinka claims that had he known of the rule, his wife would not have entered into the February 23 contract, and that he would have closed both positions on February 24. He also charged that the broker should have advised him to spread his position to offset potential losses.[9]

The Administrative Law Judge (ALJ) who considered the case concluded that Blunt Ellis and its agents had not violated the anti-fraud provision of the CEA, see 7 U.S.C. § 6b quoted in n. 11 *infra*, and that information concerning the expanded price limit was not material. *Hlavinka v.*

*Blunt, Ellis & Loewi, Inc.*, [1986–1987 Transfer Binder] COMM.FUT.L.REP. (CCH) ¶ 23,324 (Oct. 22, 1986). The ALJ observed that Hlavinka had been familiar with the market's price limits. In light of Hlavinka's awareness of market fluctuations and the risks of commodity trading, the ALJ was not persuaded by Hlavinka's assertion that he would have altered his investment strategy had he known of the expanded limit rule. Moreover, the ALJ pointed to a letter written by Hlavinka on March 4, 1983 in which the petitioner admitted that he had been told of the market's expanded limits on February 25, 1983. These factors caused the ALJ to rule against materiality.

The ALJ concluded that Hlavinka failed to establish causation between the omission and the market positions he and his wife had taken. The ALJ also ruled that no calculable damages resulted from the failure to advise Hlavinka to spread positions. Accordingly, the action was dismissed on October 22, 1986, and Hlavinka appealed to the CFTC. On September 18, 1987, the CFTC affirmed the ALJ's ruling without opinion. This appeal followed.

## II.

### Analysis

The exchange of commodity futures is governed by the CEA, codified at 7 U.S.C. § 1 *et seq.*[10] Under the Act, an aggrieved customer can institute a reparations action against a futures commission merchant and its agents. 7 U.S.C. § 18; *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 836, 106 S.Ct. 3245, 3250, 92 L.Ed.2d 675. Hlavinka's reparations action was brought under the anti-fraud provision, Section 4b of the CEA.[11] When reparations actions are re-

---

9. Hlavinka further argued that Fromm had delayed in executing some of his orders. He does not press this assertion on appeal.

10. Commodities trading has been explained in *United States v. Dial*, 757 F.2d 163, 164–166 (7th Cir.1985), certiorari denied, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95. See also Fishman, *Commodities Futures: An Introduction for Lawyers*, 65 Chicago Bar Record 306 (1984).

11. Section 4b of the Act provides:
   It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ...

viewed by this Court, the CFTC's factual findings, "if supported by the weight of [the] evidence," are taken as conclusive. 7 U.S.C. § 9; *Dohmen–Ramirez v. Commodity Futures Trading Commission*, 837 F.2d 847, 856 (9th Cir.1988); *Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Commission*, 850 F.2d 742, 746–747 (D.C.Cir.1988). Indeed, the standard of review is very narrow:

> The function of this court is something other than that of mechanically reweighing the evidence to ascertain in which direction it "preponderates"; it is rather to review the record for the purpose of determining whether the finder of fact— here the ALJ—was justified.

*Chapman v. United States Commodity Futures Trading Commission*, 788 F.2d 408, 410 (7th Cir.1986) (per curiam) (citations omitted).

■ Hlavinka does not argue that the broker willfully withheld information. Rather, he claims that Fromm breached his fiduciary duty and acted negligently.[12] Hlavinka points to the fact that he always carried a "beeper" with him as proof of his intent and ability to make instantaneous market decisions. Since Blunt Ellis is not a discount brokerage firm, Hlavinka maintains that the firm had a duty to advise him fully of the market's changes and its attendant risks, and that he relied on respondents to do so. Hlavinka also complains that Fromm should have directed him to spread his and his wife's positions in order to minimize losses. Accordingly, he contends that the ALJ should not have dismissed his claims.

In this case, the ALJ found no breach of fiduciary duty. Whether an advisor's role is that of a fiduciary depends on:

> (A) to cheat or defraud or attempt to cheat or defraud such other person;
> (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
> (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such

> whether the customer is relying on [the commodity professional's] expertise and judgment in either entering the market or in making trading decisions. Where the professional's role is not of that nature, such as where the customer makes his own independent trading decisions and the professional's role is therefore largely clerical, the duty to disclose material facts is less. . . .

2 P. Johnson, *Commodities Regulation* § 5.49, at 353–354 (1982). The ALJ noted that Hlavinka did not rely entirely on Fromm's advice in conducting his trading. In fact, the decision to speculate in the 5000–ounce silver market was Hlavinka's alone, and there was evidence that at least one of the executed orders was "unsolicited" by Fromm. The ALJ also determined that Hlavinka knew of the risks involved in trading silver futures, and that he had learned of the expanded price limit rule on February 25. In these circumstances there is no need to disturb the ALJ's finding that Hlavinka failed to establish a breach of fiduciary duty.

■ There is also no basis for Hlavinka's claim of negligence. As we have recently held, "for commodities fraud, negligence is not enough." *Tamari v. Bache & Company (Lebanon) S.A.L.*, 838 F.2d 904, 908 (7th Cir.1988). To the same effect see also *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 822 (10th Cir.1986). Of course, Hlavinka could prevail by showing that the broker was reckless and that the withheld information was material. *Drexel Burnham Lambert, Inc.*, 850 F.2d at 748; *First Commodity Corporation of Boston v. Commodity Futures Trading Commission*, 676 F.2d 1 (1st Cir.1982); see also *Flaxman v. Commodity Futures Trading Commission*, 697 F.2d 782, 787 (7th Cir.

> order or contract, or in regard to any act of agency performed with respect to such order or contract for such person. . . .
> 7 U.S.C. § 6b.

12. If true, the other respondents would be liable to Hlavinka under the theory of *respondeat superior*. Section 2(a)(1)(A) of the CEA, 7 U.S.C. § 4; *Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir.1987).

1983) (standard of "willfulness" includes careless disregard).[13] However, this possibility was foreclosed because, as the ALJ properly ruled, the expanded limit rule was not material information in the present case.

The critical inquiry for materiality is what effect the failure to apprise Hlavinka of the expanded limit rule might have had on his decision to stay in the market. See *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (materiality is determined by whether there was a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]").[14] The ALJ's conclusion that Hlavinka's losses were not caused by the broker's failure to tell him of the expanded limit rule was appropriate. The ALJ correctly observed that while price limits have a restraining effect on volatile price movements, they do not cause the movements. The Hlavinkas' losses were due to the declining price of silver futures, not to the rule's application. "[I]t may be impossible for [the customer] to liquidate his position on market days when trading is inactive due to the fact that the price has risen or fallen to the exchange's daily maximum allowed change for that day." 1 P. Johnson, *supra*, § 3.107, at 552. While application of the expanded limit rule allows a market greater range in which to operate, when the market is declining (as occurred here), the price will soon lock down. As one commentator noted,

> [D]aily price fluctuation limits do not necessarily affect the market *trend*, ... and it frequently happens that, when a major market development occurs, a futures contract will experience successive "limit up" or "limit down" days until the price adjusts fully to that news. A serious side effect of successive limit up or limit down days is that persons suffering losses may be unable to liquidate their positions as trading promptly reaches the maximum price limit and, with market participants unwilling to accept a price within the permissible range, trading ceases until the next day when the new limit is in force. This experience can be repeated for a number of trading sessions and losses can be greatly amplified.

1 P. Johnson, *supra*, § 2.20, at 244–245 (emphasis in original). Furthermore, although Hlavinka attempted to liquidate once he learned of the expanded limit situation, he later decided to retain one of the contracts. Thus it is clear that Hlavinka's market strategy was not influenced by his knowledge of the expanded limit rule.

Finally, the ALJ was correct in finding that no fraud occurred in the failure to direct Hlavinka to spread his investment. In fact, such a strategy is not always effective in reducing an investor's loss, as indicated in the risk disclosure statement given to Hlavinka by Blunt Ellis. See also *Hill*, 790 F.2d at 824 (noting that courts are reluctant to find fraud where customers have received risk disclosure documents). For these reasons, Hlavinka's petition for review is denied.

---

**13.** Although tension exists between the "careless disregard" language of *Flaxman* and that of more recent cases, e.g., *McLaughlin v. Richland Shoe Company*, —— U.S. ——, 108 S.Ct. 1677, 100 L.Ed.2d 115, there is no need to address this issue here.

**14.** Unfortunately, "[t]ests of materiality of misrepresentations, omissions, false reports, etc. have not yet evolved in commodities law. When they do, they should approximate the important-to-a-reasonable investor (or trader) test of 10b–5 and the securities laws." 1 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud*, § 4.6, at 82.370 (1988); see also *Saxe v. E.F. Hutton & Company, Inc.*, 789 F.2d 105, 111 (2d Cir.1986). Therefore, reliance on *Northway* is appropriate.