19 F.3d 28
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Brian D. OLSON, Petitioner,
v.
COMMODITY FUTURES TRADING COMMISSION; Lind-Waldock & Co.,
Respondents.
 No. 92-70846.
 United States Court of Appeals, Ninth Circuit.
 Submitted Feb. 7, 1994.*
Decided Feb. 16, 1994.
 
 Before: SCHROEDER, CANBY and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Brian D. Olson petitions pro se for review of an order of the Commodity Futures Trading Commission (CFTC) affirming the initial decision of an administrative law judge (ALJ) denying Olson's claim for reparations under the Commodity Exchange Act, 7 U.S.C. Sec. 1 et seq. Olson contends the ALJ and CFTC erred by (1) finding that he had ratified unauthorized trading in his account by his father, David Olson, and (2) refusing to address issues regarding alleged unauthorized trading in his account by respondent Lind-Waldock & Co. (Lind). We have jurisdiction under 7 U.S.C. Sec. 18(g), and we affirm.[1]
 
 
 3
 * Background
 
 
 4
 In early 1986, David Olson, Brian's father, opened a trading account with respondent Lind. This account was assigned account No. 76692. Later that same year, Brian and David Olson opened a joint trading account with respondent Lind. This account was assigned account No. 54912.
 
 
 5
 In May 1988, David converted account No. 76692 into a joint account between himself and Brian. The Olson's requested, and Lind agreed, that account No. 54912 was to be a draw account for cash deposits, withdrawals and securities, and that account No. 76692 was to be the main trading account. In August 1989, account No. 76692 became inactive.
 
 
 6
 The status of account No. 54912 was changed three times by the Olson's in May and July of 1989. On May 17, the account was changed to a single proprietor account in the name of Brian. On July 11, the account was changed back to a joint account. On July 20, the account was redesignated a single proprietor account in Brian's name.
 
 
 7
 From July 1989 until December 1990, account No. 54912 was carried in Brian's name only, and all taxable income was reported to the Internal Revenue Service under Brian's social security number. Lind had no written authorization from Brian permitting David to trade on this account after August 1989.
 
 
 8
 From the date in 1986, when account No. 54912 was first opened, until June 1990, David and Brian lived together in Minneapolis. They shared the same mailing address and telephone number. They also apparently shared the same access code for their respective trading accounts.
 
 
 9
 Between August 1989 and June 1990, David spoke with Lind whenever Lind called to confirm trades Brian had entered. David also called Lind to dispute executions of orders in account No. 54912 whenever David felt the manner in which the order was filled was not "reasonable." David also apparently opened all mail related to the Lind accounts.
 
 
 10
 In June 1990, Brian began to prepare for a move to California. At this time, he reduced his account holdings to a flat position plus Treasury Bills. Between June and August 1990, Brian continued to use the Minneapolis address for his Lind account.
 
 
 11
 Brian disputes three sets of trades which took place between June 19, 1990 and August 17, 1990. The first of these sets of trades involved pork belly futures contracts David ordered in Brian's account. Between June 19 and June 25, David purchased 35 pork belly futures contracts: 5 at 63.12, 10 at 63.20, and 20 at 57.40. On July 9, 1990 the 35-contract pork belly position became subject to a two-day margin call because Brian's account did not have sufficient cash equity to cover the open positions established by the June pork belly trades. That same day, David sought to meet the margin call by submitting a check to Lind for $10,000. Lind declined to accept the check for "ownership reasons" because David was not the account owner or authorized manager, and returned the check by letter dated July 18, 1990.
 
 
 12
 On July 11, the day the margin call was due, David entered a limit order to sell the 35 pork belly contracts at 51.40. Instead, in order to minimize its downside risk in view of the margin call, Lind substituted its own sell order. The 35 contracts were ultimately sold for 48.575, resulting in a loss of $158,732 to Brian's account.
 
 
 13
 The second set of trades involved 2 pork belly contracts bought and sold by David in July for a gain of $629.60.
 
 
 14
 The third set of trades involved dollar index contracts purchased by David, two bought on July 18 and 3 bought on August 15. These contracts were liquidated by Lind on August 17 for a loss of $3,751.
 
 
 15
 By letter dated August 7, 1990, and apparently received by Lind on August 17, Brian specifically disavowed any prior knowledge or authorization or subsequent ratification of trades made in his account by his father and executed after June 15, 1990. Brian also requested that Lind continue to use his Minneapolis address until told otherwise. Lind responded by letter dated August 20, informing Brian that they had liquidated the open positions held in his account on August 17.
 
 
 16
 By letter dated August 28, 1990, Brian informed Lind of his new address in San Diego, California and requested that any further communications be sent to that address. Brian again disavowed any trades made by his father and denied ratifying those trades.
 
 
 17
 Throughout the period of June through August 1990, Lind mailed daily "confirms" and monthly account statements to the Minneapolis address listed on Brian's account.
 
 
 18
 On April 8, 1991, Brian filed a pro se reparations complaint with the CFTC alleging that Lind had permitted David to enter into unauthorized trades on Brian's account during the period between June 19, 1990 and August 17, 1990. Brian alleged total damages of $161,853.40 arising out of the three sets of unauthorized trades detailed above. Lind denied liability, pleaded the affirmative defenses of ratification and estoppel, asserted David had apparent authority to trade Brian's account, and counterclaimed for expenses and attorney fees.
 
 
 19
 An oral hearing before an ALJ was held on December 2, 1991. On February 5, 1992, the ALJ filed his Initial Decision. In his decision, the ALJ found that Lind had permitted unauthorized trading by David in Brian's account. Nonetheless, the ALJ concluded that Brian had full knowledge of all circumstances surrounding the trades and had ratified them. The ALJ specifically found the testimony of David Olson not credible and rejected Brian Olson's version of events.
 
 
 20
 Brian appealed to the CFTC, challenging the ALJ's liability analysis and arguing that the ALJ had failed to rule on his separate allegations that Lind had itself had engaged in unauthorized trading in Brian's account when it executed its own sell order on the 35 pork belly future contracts. On December 10, 1992, the CFTC issued an order affirming the Initial Decision of the ALJ. The CFTC found that (1) the ALJ had properly resolved the liability issue and (2) Brian had not raised the issue of Lind's alleged unauthorized trading in the complaint before the ALJ.
 
 II
 Discussion
 1. Standard of Review
 
 21
 "On appeal to this court, the factual findings of the CFTC are conclusive 'if supported by the weight of the evidence.' " Morris v. Commodity Futures Trading Comm'n, 980 F.2d 1289, 1292 (9th Cir.1992) (quoting 7 U.S.C. Sec. 9). The "weight of the evidence" is interpreted to mean "the preponderance" of the evidence. Id.; Dohmen-Ramirez v. Commodity Futures Trading Comm'n, 837 F.2d 847, 856 (9th Cir.1988). Although it is the decision of the CFTC which is reviewable on appeal, not the decision of the ALJ, Morris, 980 F.2d at 1293, "credibility determinations made by an ALJ are given great deference and upheld 'unless they are inherently incredible or patently unreasonable.' " Dohmen-Ramirez, 837 F.2d at 856 (quotation marks omitted) (quoting Photo-Sonics, Inc. v. NLRB, 678 F.2d 121, 123 (9th Cir.1982)).
 
 2. Analysis
 
 22
 Knowledge of the relevant facts of a trade and the intent to approve the unauthorized trade subsequent to its execution are the preconditions to ratification. See, e.g., Drexel Burnham Lambert Inc. v. Commodity Futures Trading Comm'n, 850 F.2d 742, 750 (D.C.Cir.1988) (collecting cases).
 
 
 23
 Here, evidence adduced at the hearing before the ALJ indicated that Brian and David Olson had a history of joint trading spanning several years prior to the instant events. David often spoke with Lind on Brian's behalf, even after account No. 54912 became Brian's sole property in July 1989, and argued with Lind regarding what David considered to be irregularities in filling Brian's requested trades. All mail in Brian's account was sent to the house Brian shared with David. Lind employees testified that David traded in Brian's account even before June 1990. Brian and David shared the same access code for their respective Lind accounts.[2]
 
 
 24
 The ALJ specifically found that David Olson's testimony "did not appear to be truthful and forthright." The ALJ concluded that David, with the knowledge and consent of Brian, had exercised hidden control over Brian's account with Lind and that "[w]hen things went wrong, [David] sought to shift responsibility by contending that Lind permitted unauthorized trading." The CFTC essentially adopted these findings of the ALJ and concluded that "the result reached by the ALJ is substantially correct."
 
 
 25
 In light of the evidence in the record before us and the ALJ's credibility findings, we hold that the weight of the evidence supports the conclusion that although Lind permitted unauthorized trading in Brian's account by David Olson, Brian had knowledge that his father was trading in his account during the period in question and that he intended to approve the unauthorized trades subsequent to their execution. See Drexel Burnham Lambert Inc., 850 F.2d at 750.
 
 
 26
 Brian Olson also contends the ALJ and the CFTC ignored the argument raised in his complaint that Lind itself engaged in unauthorized trading in his account. This dispute arises out of Lind's decision to sell the 35 pork belly contracts at 48.575 rather than at 51.40 as David Olson had requested. The language of the complaint makes it clear that this contention was raised not as a dispute between Brian Olson and Lind, but as a dispute between David Olson and Lind. Furthermore, Brian's only purpose in raising this issue at the hearing before the ALJ was to prove that Lind had responded to David Olson as though he were authorized to trade in Brian's account. Accordingly, because this issue was not raised in Brian Olson's complaint, we decline to address it for the first time on appeal. See Dohmen-Ramirez, 837 F.2d at 859 (declining to address issue where neither the ALJ nor the CFTC had opportunity to evaluate evidence in support of petitioner's claim).
 
 
 27
 DENIED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Respondent Lind-Waldock & Co.'s motion for leave to file appearance and to join in the brief of respondent CFTC is granted
 
 
 [2]
 Brian Olson maintains that this access number is based upon the account holder's telephone number and that, because he and his father shared a single phone number, David and Brian were assigned the same access code. Lind counters that customers could change their access codes at any time