INDOSUEZ CARR FUTURES,
INCORPORATED,
Petitioner,

v.

COMMODITY FUTURES TRADING
COMMISSION, Respondent,

and

Al Baraka Investment and Development
Company, Intervening Respondent.

No. 93–2189.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1994.

Decided June 27, 1994.

Andrew R. Running (argued), Kirkland & Ellis, Chicago, IL, for petitioner.

Jay L. Witkin, James T. Kelly, John A. Knight (argued), Commodity Futures Trading Com'n, Washington, DC, for respondent.

Ray G. Rezner (argued), W. Scott Porterfield, Elyse M. Tish, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for intervenor-respondent.

Before SPROUSE,* CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Among the more predictable features of warfare are the tales of financial killings or, more likely, financial ruin that resonate long after the battle is over. The recent war in the Persian Gulf was no exception. Al Baraka Investment and Development Company lost $1.7 million dollars in commodity futures trading during the war; Al Baraka's account executive, Abdulmonem Addas, lost his job when it was revealed that he had repeatedly lied to Al Baraka about the trades. Al Baraka filed a reparations complaint against Indosuez before the Commodities Futures Trading Commission alleging violations of the Commodity Exchange Act (CEA or Act), 7 U.S.C. § 1 *et seq.* An ALJ granted the

* Judge James M. Sprouse, Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, is sitting by designation.

reparations award to Al Baraka based upon Addas' misrepresentations, and the CFTC affirmed. Indosuez now petitions for review of the CFTC order.

## I.

Indosuez, a registered futures commission merchant, hired Addas as an account executive in October 1990, unaware that two of Addas' former customers had filed complaints against him alleging misrepresentation about trading risks. Upon arriving at Indosuez, Addas solicited business from Khaled Shair, the Chicago-based regional director of a Saudi Arabian holding company, Al Baraka Investment and Development Company (Al Baraka). Shair was also the CEO of Al Baraka Bancorp, Al Baraka's domestic subsidiary, and had worked for nearly 18 years with the Arab Bank. Although he had supervised a securities and options account in the past, he had no experience in commodity futures.

Shair told Addas that he wished to trade conservatively and to limit his risk to a prescribed percentage of principal. Addas drafted a proposal stating that Al Baraka wanted to "risk the equivalent of 7% or 8% of the amount of principal." Addas assured Shair that Indosuez had "the know how and the techniques to hedge the account all the time against the down side."

On October 31, 1990, Shair opened a non-discretionary account (meaning he retained full control and confirmed all trading decisions) and signed Indosuez' standard documents such as a Customer Agreement, a Futures Risk Disclosure Statement and an Options Risk Disclosure Statement. Shair did not fund the account, however, until the parties agreed on further terms memorialized in a letter of November 15 signed by Addas and Indosuez' chief financial officer. The agreement read in part:

> [Al Baraka's] objective is to limit [its] net losses on this account to $150,000. If the value of the account falls below $1,850,000, [Indosuez] is instructed to close the account immediately. If [Al Baraka] change[s its] loss limit for whatever reason, this must be in writing only.

Didier Varlet, the CEO of Indosuez, was concerned that the letter could imply that Indosuez was guaranteeing against losses. He notified Shair that Indosuez could not make trading decisions for Al Baraka and could not guarantee against substantial losses. Varlet requested that Al Baraka "accept and confirm" this understanding in writing; although Shair and Varlet spoke on the telephone, Shair did not send written confirmation.

On November 16, Shair deposited $2 million in the account and began trading in gold, silver and yen futures. Shair and Chari Aweidah, Al Baraka's controller in the Chicago office, reviewed account statements daily. In December 1990, Addas recommended a new trading strategy, establishing long positions in dollars and short positions in foreign currencies to take advantage of the mounting Gulf crisis. Addas told Shair that the positions were protected and hedged.

By December 28, the net market value of Al Baraka's account was $1,896,349. Disappointed, Shair met with Addas on New Year's Eve and instructed him to close the account. But Addas insisted that the account should not be closed because it was fully hedged. Addas assured Shair that the account would have a value of $2.1 million by February 8, 1991, when certain options expired. Shair agreed to keep the account open temporarily.

On January 2, the market value of the account fell to $1,845,604, or $4,396 below the stop order. Shair testified that he did not close the account because Addas had promised it would have a value of $2.1 million on February 8. The account did rebound, and on January 16 had a market value of $2,051,046.

But on January 16 the bombing of Baghdad began and the value of the account dropped to $1,593,169. In several taped telephone calls, Addas told Shair not to worry: that the equity in the account was $2,057,000 rather than the market value; that the account was fully hedged; and that Al Baraka's account would be worth $2,077,000 on February 8. Addas repeated these statements in a meeting on January 22.

On January 23, Addas confirmed in writing that the value of Al Baraka's account would be around $2,096,869 on February 9. The letter read in part:

As of today, Total Equity stands at USD 2,098,869.64 and Market Value of USD 1,640,573. If by the expiration of the options, 9 February, their value is zero the market value would be USD 2,098,869.64; on the other hand, if we hedge the Sterling position by buying futures Sterling in order to deliver them on expiration (if options are exercised) your equity should be around USD 2,096,869.64. Naturally, this reflects the settlement prices from the Silver futures and options as of yesterday's close. However, assuming the account does not realize actual profit or losses between now and 9 February 1991, the equity should be around USD 2,096,869.64.

Shair testified that without this letter, he would have closed the account and accepted the $400,000 of losses. Addas continued to insist that the position was hedged. Addas also told Shair that the daily account statements were incorrect or misleading; Shair believed Addas since Indosuez very frequently sent amendments or corrections to the statements.

The walls started to crumble around Addas on February 4, when the net market value of the Al Baraka account dropped sharply to $820,831, resulting in a margin deficit of $811,131. Addas told Shair that the account statements indicating such a drop were "completely inaccurate," and that the account would be worth $2.2 million in four days. Addas did not mention the margin deficit. Shair demanded written confirmation of these representations, which Addas provided the next day. Addas also told the Indosuez management that Shair would meet the margin call, even though Addas and Shair had never spoken about the deficit.

Addas, Shair and Varlet met on February 6, when Addas admitted that the account was not hedged. Varlet demanded that Shair meet the margin call (which had now risen to $1,163,752). Shair presented Varlet with Addas' letters and offered to settle for $1,850,-000, but Varlet refused. The account was liquidated and closed with a balance of $264,-095. Shortly thereafter, Indosuez asked Addas to resign.

On April 10, 1991, Al Baraka filed its reparations complaint alleging fraud, misrepresentation, unauthorized trading, failure to supervise and failure to register.[1] The ALJ made detailed findings of fact and specifically found Shair's testimony credible. The ALJ found that there could be no dispute that Addas had repeatedly misrepresented the risk of trades for the account, and that the "unavoidable conclusion [was] that Shair in fact relied on Addas' misrepresentations." Although Shair understood market risk and had signed risk disclosure forms, the ALJ found that "Addas nevertheless persuaded Shair to maintain Al Baraka's currency positions by incessantly misstating that these positions were protected and hedged. Addas not only misrepresented the risk of Al Baraka's currency positions orally, but memorialized those assurances in writing in his letter dated January 23. In this manner, Addas effectively undercut the message of market risk conveyed in the daily account statements." The ALJ rejected Indosuez' argument that Al Baraka was merely "free riding," finding that Shair never tried to impose liability on Indosuez but merely sought to trade conservatively. The ALJ concluded that Addas had cheated and defrauded Al Baraka in violation of § 4b of the Act, 7 U.S.C. § 6b, and that Indosuez was liable for the $1,716,608 damages.[2] The CFTC summarily affirmed.

1. All persons who solicit or accept customer's orders for a futures commissions merchant must be registered with the CFTC. 7 U.S.C. § 6k; 17 C.F.R. § 3.12. In one of their early meetings, Shair asked Addas whether he had a proper license to trade. Addas answered, "yes, I got everything and Indosuez will not hire me or allow me to talk to any customer without complet[ing] all these requirements." In fact, however, through what Indosuez claims was a clerical oversight, Addas was never registered with the CFTC.

2. Section 4b of the Act provides in part:

It shall be unlawful ... for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract

## II.

■ Clearly Addas violated the Act by misrepresenting material facts related to the value of the account and risk projections. *See Levine v. Refco, Inc.,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,-488 at 36,115–16 (CFTC July 11, 1989) (fraud in the inducement to open or maintain a futures trading account actionable). But to recover, an investor must show that it is more likely than not that her losses were proximately caused by the misrepresentations. *Steen v. Monex,* [1990–1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,245 at 38,723 (CFTC March 3, 1992). An investor must establish that the misrepresentations were a "substantial factor" in the incurring of her losses—or in other words, that she relied on the misrepresentations. *Id.* Indosuez argues that the ALJ erred when he found that Shair relied on Addas' numerous misrepresentations.

### A.

■ Indosuez' main argument is that a complainant should be able to recover only if he proves that his reliance on the misrepresentations was reasonable. The ALJ refused to place the affirmative burden of proving reasonableness on Al Baraka, finding that such a burden was contrary to settled case law (but not citing any cases). The ALJ also found that *Steen v. Monex,* which Indosuez argued set forth a reasonableness requirement, was distinguishable. Thus the ALJ did not specifically reject the argument that the complainant's conduct could in certain cases be a defense, but found only that no such argument was available here. Although Indosuez suggests that whether a plaintiff is required to show "reasonableness" is a ques-

tion of law that we review de novo, the CFTC's interpretations of the Act are entitled to *Chevron* deference. *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 844, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986).

■ Indosuez argues that since common law fraud includes a "reasonable" reliance standard, so too should fraud under the Act. *See, e.g., Puckett v. Rufenacht, Bromagen & Hertz,* 903 F.2d 1014, 1018 (5th Cir.1990); *Horn v. Ray E. Friedman & Co.,* 776 F.2d 777, 780 (8th Cir.1985) (analogizing fraud under § 4b to common law fraud). In Illinois, "reasonableness" in some circumstances means that an investor has a duty to investigate. *Central States Joint Bd. v. Continental Assurance Co.,* 117 Ill.App.3d 600, 73 Ill.Dec. 107, 112, 453 N.E.2d 932, 937 (1983). But common law fraud may differ somewhat from fraud under the securities and commodities laws, *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 531 (7th Cir.1985), and "a customer does not have a duty to investigate the truth of the statements made to him, but may ordinarily rely on the honesty of his account representative's representations." *Jakobsen v. Merrill Lynch,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,812 at 31,393 (CFTC November 21, 1985) (reversing Judgment Officer's finding that investor had not made inquiries and therefore was not justified in relying upon broker's misrepresentations).

In some sense, "reasonableness" merely restates the requirement that the misstatements actually cause the injury. "Justifiable reliance is not a theory of contributory negligence; rather it is a limitation ... which insures that there is a causal connection between the misrepresentation and the plain-

---

market, for or on behalf of any other person ...
(A) to cheat or defraud or attempt to cheat or defraud such other person....
7 U.S.C. § 6b.
Commission Regulation 33.10, 17 C.F.R. § 33.-10, provides:
It shall be unlawful for any person directly or indirectly:
(a) To cheat or defraud or attempt to cheat or defraud any other person;
(b) To make or cause to be made to any other person any false report or statement thereof or

cause to be entered for any person any false record thereof;
(c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.
Section 14 of the Act, 7 U.S.C. § 18, allows an aggrieved customer to institute a reparations action against a futures commission merchant and its agents.

tiff's harm." *Teamsters Local 282*, 762 F.2d at 531, *quoting Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1517 (10th Cir.1983); *Jakobsen*, ¶ 22,812 at 31,392. Thus, when an investor claims to have been duped by wildly improbable statements, he will find it very difficult to prove that he actually relied on these statements and that such reliance caused his losses. *See, e.g., Heublein v. Int'l Trading Group, Inc.*, Comm.Fut.L.Rep. (CCH) ¶ 25,-591 at 39,848–49 (CFTC October 2, 1992). For example, in *Steen v. Monex*, an attorney familiar with stocks traded in silver futures before becoming disillusioned. ¶ 25,245 at 38,721. She claimed she was misled by a broker who told her on one occasion that silver prices would rise from $11 to $100–$150. The ALJ awarded damages, but the Commission reversed. The Commission found it "incongruous" that she would believe the statement about price, and that her speculative trading over seven months was inconsistent with a genuine belief in the broker's representations. *Id.* at 38,723. Indosuez argues that *Steen* thus established a "reasonableness" requirement. But the Commission merely rejected Steen's claim that she actually relied on her broker's statements. *See e.g., Heublein*, ¶ 25,591 at 39,848 (*Steen* holds that "protestations of reliance ... may be overcome by later inconsistent conduct or may be deemed implausible in light of a complainant's character and circumstances").

In any event, these analytical questions are not entirely new. We have already rejected this sort of reasonableness requirement under the securities laws, *Teamsters Local 282*, 762 F.2d 522, and the same standard should apply here. *Hlavinka v. Commodity Futures Trading Comm'n*, 867 F.2d 1029, 1034 n. 14 (7th Cir.1989) (commodities laws should track securities laws); *Greenwood v. Dittmer*, 776 F.2d 785, 789 n. 4 (8th Cir.1985); *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Curran*, 456 U.S. 353, 389 n. 88, 102 S.Ct. 1825, 1844 n. 88, 72 L.Ed.2d 182 (1982). This appears to be consistent with the CFTC's interpretation of the Act. *See Steen*, ¶ 25,245 (Gramm, concurring); *Jakobsen*, ¶ 22,812. The district court in *Teamsters Local 282*

applied the very standard Indosuez seeks here, holding that a plaintiff seeking recovery under the securities laws [3] was required to prove "justifiable reliance" on the misrepresentations. 762 F.2d at 525. This court rejected this standard: "This line of argument ... fails because it does not give to the seller's obligation to tell the truth the primacy that obligation must have. Securities law seeks to impose on issuers duties to disclose, the better to obviate the need for buyers to investigate ... we will not establish a legal rule under which investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud." *Id.* at 528.

This conclusion is consistent with the rule that contributory negligence is not a defense to an intentional or reckless tort. *Id.* For this reason, we had previously concluded that a buyer's failure to exercise due care was not a defense in a 10b–5 case. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). The same logic applies to fraud under § 4b of the CEA. "Liability follows from wilful misstatements or omissions plus causation in fact, not from 'justifiable reliance' in the common sense of that term." *Teamsters Local 282*, 762 F.2d at 529. Adopting the *Teamsters Local 282* standard leads to the conclusion that the ALJ employed the appropriate proximate cause analysis in this case by inquiring whether Shair actually relied on Addas' misrepresentations. Since the ALJ found that Shair kept the account open only because of Addas' false promises, Shair was entitled to recover.

■ But *Teamsters Local 282* also found that there are some occasions when the plaintiff's "gross conduct somewhat comparable to that of the defendant" could bar recovery. 762 F.2d at 529, *quoting Sundstrand*, 553 F.2d at 1048. *Teamsters Local 282* identified three instances in which "even lies are not actionable." 762 F.2d at 529. Generally,

**3.** The plaintiff sued for violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. 240.10b–5; and Illinois common law. *Teamsters Local 282*, 762 F.2d at 525.

"an investor cannot close his eyes to a known risk," meaning that, when an investor knows that a representation is false, he cannot act upon it and later claim deception. *Id.* This seems axiomatic given the requirement that the misrepresentations be a "substantial factor" in the losses. *Steen,* ¶ 25,245 at 38,723.

A narrower application of this general principle is that an investor who has information known by him to be accurate cannot rely instead upon an isolated oral variance contradicting the truthful information. *Teamsters Local 282,* 762 F.2d at 529; *Zobrist v. Coal-X,* 708 F.2d at 1517. And an investor may also be barred from recovery when the misrepresentation concerns things actually known to the investor equally or better than to the speaker. *Teamsters Local 282,* 762 F.2d at 529.

██ At oral argument, Indosuez argued that Shair's conduct falls within these first two categories: ignoring a known risk and improperly relying on oral variations from otherwise truthful disclosures. But the ALJ's findings of fact are to the contrary. Regarding the claim that Shair closed his eyes to a known risk, the ALJ found that Addas' misstatements—that the account was hedged and that the account balance sheets indicating severe losses were wrong—did in fact change Shair's perception of risk, and thus he cannot be said to have proceeded recklessly in the face of that risk. As we discuss below, these credibility findings are entitled to deference.

██ Indosuez also argues that Addas' misstatements were simply oral variances from otherwise truthful written information, and thus not actionable under the standard set forth in *Teamsters Local 282.* But Addas' misstatements were somewhat more than mere casual "variances" from otherwise truthful information. Several times—notably in the letters of January 23 and February 5—Addas put his misrepresentations in writing. The persistence of Addas' misrepresentations in the face of repeated requests for clarification distinguishes this situation from those in which an investor seeks to rely on a few isolated statements that contradict all other evidence. Thus the ALJ's findings about the extent of Addas' misrepresenta-

tions and Shair's repeated decisions in reliance on these misstatements make clear that Indosuez cannot rely on *Teamsters Local 282* for a defense.

## B.

██ In a related argument, Indosuez contends that the ALJ erred when it found that Shair actually relied on Addas' misrepresentations. This dovetails with Indosuez' argument that Shair ignored the known risk that Addas' statements were untrue. Indosuez has an uphill battle, since we review findings of fact to determine if they are supported by "the weight of the evidence." 7 U.S.C. § 9. And "although a reviewing court generally gives substantial deference to the factual findings of an ALJ, this deference is even greater when credibility determinations are involved." *Gimbel v. Commodity Futures Trading Comm'n,* 872 F.2d 196, 199 (7th Cir.1989). The ALJ specifically concluded that Shair's testimony was credible and consistent with the taped telephone calls and documentary evidence; although the evidence certainly shows that this was a close case, we cannot conclude that the ALJ erred.

Indosuez' arguments that Shair was "evasive" or played dumb do not go very far, since such determinations are clearly within the province of the ALJ. Shair's credibility is also not impeached by his willingness to trade in the futures market. The ALJ found that all of Shair's actions were consistent with a desire to trade conservatively—hence his insistence on a stop order at the level of $1.85 million, his written statements about acceptable losses and his careful monitoring of the account.

Indosuez' stronger arguments are that Shair, a savvy international financier, knew enough about the status of his account to figure out that Addas was lying. Al Baraka had a non-discretionary account, and Shair and Aweidah reviewed the account statements daily. Indosuez claims that Shair could have determined from these account statements that the account was not hedged. But the ALJ found that the account statements alone were not enough to warn Shair that Addas was lying. Shair did not fully

trust the account statements since they frequently contained errors, but most importantly, Addas lied and told Shair that the account statements themselves were inaccurate. Even if the account statements might have given rise to doubts, since Addas' misrepresentations extended to the validity of the documents themselves, the ALJ did not err in determining that Shair relied on Addas' statements that the account was hedged.

Indosuez also argues that Shair should have known better than to believe Addas' claims that the account would be worth $2.1 million on February 8. Shair was, after all, the CEO of a large financial company and had some prior experience trading securities. He no doubt was aware that trading during a time of international crisis carried some unusual risks. On the other hand, Shair had no experience in futures trading, and general financial sophistication does not always import the insight to spot lies about the futures market. *See, e.g., Jakobsen v. Merrill Lynch*, ¶ 22,812 at 31,393; *Weinberger v. First National Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,845 at 31,481 (CFTC Dec. 16, 1985). This is certainly a much closer case than it would have been had Shair not been far more sophisticated in these matters than the average investor. But the ALJ also knew of Shair's financial expertise and still found his testimony credible and that his behavior—particularly his decisions to keep the account open based upon Addas' promises that it would be profitable when options expired in February—was consistent with his claim that he trusted Addas. Given the nature of Addas' repeated lies over the short term of their relationship, the ALJ's conclusion is sound.

In what appears to an agency argument, Indosuez also argues that Al Baraka as a whole certainly knew enough about futures trading to discredit Addas' statements, and therefore all of the company's knowledge should be imputed to Shair. But there was no evidence that anyone at Al Baraka other than Shair participated in this trading account. Indosuez essentially seems to argue that Al Baraka was negligent or reckless when it allowed Shair to deal with Indosuez, and that this negligence or recklessness should let Indosuez off the hook. But such theories of imputed knowledge tend to lead us too far away from the basic causation principles at issue here. There is no proof that Shair knew everything that Al Baraka may have known, and thus Al Baraka's institutional savvy is not directly relevant.[4]

## C.

Al Baraka's reparations complaint also alleged that Indosuez' failure to register Addas as an associated person was another source of liability. The ALJ did not rule on this issue, but the Commission held that Addas' misrepresentation of his registered status and Indosuez' failure to register Addas constituted an independent basis for affirming the ALJ's award. Since we affirm for the reasons given by the ALJ, we do not need to reach this issue. The petition for review is DENIED.

---

**4.** Indosuez also argues that it was not permitted to engage in full discovery of Al Baraka's actual knowledge. Indosuez requested all account statements "for any bank, commodity futures, options or securities trading accounts" held by Al Baraka worldwide. Al Baraka produced the documents related to the Chicago office, which, according to Al Baraka, was the only office involved in the Indosuez account. The ALJ ruled that Al Baraka's compliance was sufficient since the rest of the company's expertise in futures trading was irrelevant absent any evidence that Shair had access to this expertise. Since Al Baraka's knowledge cannot be imputed to Shair, the ALJ's decision was correct. In any event, the ALJ did not abuse its discretion in ruling that Al Baraka had provided sufficient information in response to an overly broad discovery request. *Cf. Dick v. Chicago Commodities Inc.*, [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,-934 at 31,738 (CFTC February 3, 1986) (ALJs have broad discretion over discovery and will not be reversed absent an abuse of discretion).