In the

United States Court of Appeals

For the Seventh Circuit

Nos. 99-4142, 99-4143 & 00-3734

Commodity Trend Service, Inc.,

Plaintiff-Appellant,

v.

Commodity Futures Trading Commission,

Defendant-Appellee.



Commodity Futures Trading Commission,

Petitioner-Appellee,

v.

Dennis Blitz and Nick Van Nice,

Respondents-Appellants.



Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
Nos. 97 C 2362 & 98 C 6057--Wayne R. Andersen,
Judge.


In Re:

CTS Financial Publishing, Inc.,
f/k/a Commodity Trend Service, Inc.,
Dennis Blitz, Nick Van Nice, and
Dearborn Financial Publishing, Inc.,
Petitioners.



Petition for Writ of Injunction against the
Commodity Futures Trading Commission
No. 00-34


Argued November 9, 2000--Decided November 28,
2000



  Before Flaum, Chief Judge, and Ripple and

Kanne, Circuit Judges.

   Flaum, Chief Judge.  Plaintiff Commodity
Trend Service, Inc., now known as CTS
Financial Publishing, Inc. ("CTS"),
appeals the determination that it is
subject to the antifraud provisions of
the Commodity Exchange Act ("CEA"). The
principals of CTS, Dennis Blitz and Nick
Van Nice, appeal the enforcement of an
administrative subpoena issued by the
Commodity Futures Trading Commission
("CFTC"). For the reasons stated herein,
we affirm both of the district court's
decisions.

I.  Background

   CTS provides impersonal advice about the
commodities markets to its customers
through a number of publications and
other means, such as faxes and telephone
messages. CTS does not tailor its advice
based on the particular circumstances or
financial goals of its customers, nor
does it execute any trades on their
behalf. In addition to these products,
CTS distributes advertisements that
provide both information regarding its
wares and testimonials about the profits
that can be generated by following CTS's
recommendations. In July 1996, the CFTC
began investigating CTS to determine
whether the business should be required
to register as a commodity trading
advisor ("CTA") under 7 U.S.C. sec. 6m.
The CFTC sought to subpoena a wide range
of documents from Nice and Blitz
regarding CTS's advertisements,
publications, and other products. CTS
filed a complaint claiming on First
Amendment grounds that the CEA's
registration requirements were both
overbroad and could not be applied to
CTS. The district court held that CTS's
claims were unripe, but we reversed in
the first decision regarding this case.
See Commodity Trend Serv. v. CFTC, 149
F.3d 679 (7th Cir. 1998).

   On remand, CTS continued its facial and
as-applied First Amendment challenges to
the registration requirements and added
new arguments attacking 7 U.S.C. sec. 6b
and 7 U.S.C. sec. 6o, which are antifraud
provisions of the CEA, as well as 17
C.F.R. sec. 4.41, which is an antifraud
regulation promulgated by the CFTC that
applies to advertising. After considering
CTS's arguments, the district court found

that the registration requirements of the CEA as applied to an impersonal advisor such as CTS are a prior restraint that violates the Constitution. However, the court also held that sec. 6o and Regulation 4.41 apply to CTS, rejecting CTS's statutory and constitutional arguments (the court did not reach the question of whether sec. 6b covers CTS). On the basis of its decision, the district court granted the CFTC's motion to enforce its administrative subpoenas to the extent that the CFTC was seeking to investigate CTS regarding activities prohibited by the CEA's antifraud laws. The court denied CTS's motion to stay the enforcement of the subpoenas pending this appeal, and CTS was required to turn over various products and documents to the CFTC.

CTS appeals the district court's decision that it is subject to the CEA's antifraud provisions, and Nice and Blitz appeal the subpoena enforcement based on that decision./1 CTS does not challenge the determination that it falls within the definition of a CTA. Shortly before oral argument in this case, the CFTC, in part because of the materials discovered through its subpoenas, issued a complaint against CTS, initiating an administrative enforcement proceeding. CTS filed a motion to enjoin these proceedings until this court decided the instant case. CTS's request for an injunction is rendered moot by this decision.

II.  Discussion

This case presents three stages of analysis. Initially, we must determine whether CTS's challenges are ripe for resolution by the courts. If this case is ripe, then we must consider if two provisions of the CEA and one CFTC regulation apply to CTS as a matter of statutory interpretation. Finally, if CTS is covered by any of these statutes or regulations, we must determine whether these laws are constitutional as applied to CTS.

A.  Ripeness

The CFTC argues that neither CTS's statutory and as-applied First Amendment challenges nor its identical claims in the subpoena enforcement proceeding are ripe for judicial decision. Analyzing

each case under the applicable legal standards, we reject the CFTC's contentions and find that both cases are susceptible of judicial resolution with the exception of one constitutional issue discussed below.

1. CTS's complaint.

The legal standards for determining when an as-applied constitutional challenge is ripe are set forth in Commodity Trend Service, 149 F.3d at 688-90, and need not be reiterated at length here. An administrative determination is ripe for review if (1) it is fit for judicial resolution, and (2) the parties would endure hardship from the withholding of court consideration. See Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998) (citing Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). CTS is still suffering from the same hardships of curbing the content of its publications, being chilled from engaging in speech, and undergoing costly compliance with the CFTC's investigation that we previously found sufficient to satisfy the hardship prong of the Abbott Laboratories test. 149 F.3d at 689-90. Thus, the second part of the ripeness test is satisfied.

The CFTC focuses its challenge on the first part of the ripeness determination. The CFTC claims that this case presented a purely legal question the first time because CTS admitted that it was covered by the registration requirements of sec. 6m, and so no facts were in dispute. By contrast, in the current stage of this litigation, CTS does not admit that it is committing fraud punishable under the relevant provisions of the CEA. The CFTC argues that further factual development through administrative procedures in order to determine whether CTS is committing fraud is necessary before a court should intervene.

The CFTC's argument is foreclosed by this court's prior decision, where we held that a case is ripe under Abbott Laboratories when Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979) is satisfied. 149 F.3d at 687 & n.3. In Babbitt, the plaintiffs challenged a statute that made "dishonest, untruthful, and deceptive publicity" an unfair labor practice when used to discourage

consumers from purchasing agricultural products. 442 U.S. at 301. The plaintiffs alleged that they did not deliberately intend to publicize falsely, but that erroneous statements are inevitable in the course of public speaking. These innocent falsehoods could subject the plaintiffs to prosecution under the statute, which could be avoided only by the plaintiffs curtailing the exercise of their First Amendment rights. The Supreme Court stated that these circumstances were sufficient for the plaintiffs to have a reasonable fear of prosecution and that no further factual development was necessary. The Court thus held that the challenge in Babbitt was ripe. Id. at 302.

CTS's position is identical in all relevant respects to the Babbitt plaintiffs. CTS alleges that it does not intend to make false statements about the commodities markets, but given the volume of its publications some misstatements are inevitable. Such falsehoods would subject them to administrative investigation and proceedings by the CFTC. Because CTS had a reasonable fear of being subject to administrative proceedings at the time CTS filed itscomplaint, given CFTC's investigation and subpoenas, no further factual development is necessary. We hold that the purely legal question presented by CTS's challenge--namely, is an impersonal trading advisor subject to the fraud provisions of the CEA--combined with these facts showing a reasonable fear of prosecution satisfy the first part of the Abbott Laboratories test. Thus, CTS's complaint is ripe.

2. Subpoena enforcement proceedings.

A court exercises only limited review of an agency's actions in a subpoena enforcement proceeding and does not normally consider the merits of a party's claim that it has not violated a statute administered by the agency. As a general rule, courts enforce an administrative subpoena if: (1) it reasonably relates to an investigation within the agency's authority, (2) the specific inquiry is relevant to that purpose and is not too indefinite, (3) the proper administrative procedures have been followed, and (4) the subpoena does not demand information

for an illegitimate purpose. See CFTC v. Tokheim, 153 F.3d 474, 477 (7th Cir. 1998); EEOC v. Quad/Graphics, Inc., 63 F.3d 642, 645 (7th Cir. 1995). An agency may investigate to determine whether it has jurisdiction over a party as long as the party's conduct superficially appears to bring it within the jurisdiction of the agency, that is, as long as the agency is not engaged in impermissible overreaching. See Tokheim, 153 F.3d at 477-78. However, this general rule of limited judicial scrutiny of administrative subpoenas is subject to certain exceptions. In particular, judicial review to determine whether a party has violated the statute or regulations is appropriate at the subpoena enforcement stage if the investigation is excessively burdensome so as to threaten the normal operation of the party's business. See id. at 478; Quad/Graphics, 63 F.3d at 648-49.

We hold that the CFTC's subpoenas satisfy the four-part test, but that the excessive burden exception applies. 7 U.S.C. sec. 12(a) gives the CFTC the power to investigate persons that are covered by the CEA; CTS does not contest that it is a CTA and so subject to the CEA. The subpoenas are reasonably definite in requesting materials from CTS that are relevant to investigating whether the CEA's antifraud provisions have been violated. There is no allegation that the CFTC has not followed the proper procedures or is acting in bad faith. However, the issuance of the subpoenas has altered the normal operations of CTS's business, as related in this court's first opinion, and their enforcement would (and did) exacerbate these effects. 149 F.3d at 689-90. CTS has diluted its current publications, and has decided to abandon plans to expand its business to produce additional products. Between 1996 and 1998, CTS's sales decreased by more than twenty-five percent, a drop that CTS attributes to the CFTC's investigation and subpoenas. CTS has been forced to phase out three of its employee positions in response to its declining revenues. In addition, two of CTS's columnists have refused to write articles for fear of government reprisal. Such facts demonstrate that the subpoenas have changed the normal operations of CTS's business, and thus the merits of CTS's legal challenge can be considered

at the subpoena enforcement stage./2

B.  Statutory Interpretation

   Having found that CTS's challenges are ripe, we address its statutory arguments. CTS claims that the antifraud provisions of the CEA do not apply to impersonal commodity advisors as a matter of interpretation. The CFTC's construction of the CEA is entitled to Chevron deference. See CFTC v. Schor, 478 U.S. 833, 844 (1986); Indosuez Carr Futures, Inc. v. CFTC, 27 F.3d 1260, 1264 (7th Cir. 1994); Geldermann, Inc. v. CFTC, 836 F.2d 310, 315 (7th Cir. 1987). Under Chevron, we first determine whether Congress has addressed the question at issue. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 1300 (2000). If not, then we defer to the CFTC's construction of the CEA as long as it is reasonable. Id.


   1.  7 U.S.C. sec. 6o and 17 C.F.R. sec. 4.41.

   7 U.S.C. sec. 6o(1) states in relevant part:

It shall be unlawful for a commodity trading advisor . . . by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--

(A) to employ any device, scheme, or artifice to defraud any client . . . or prospective client . . .; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client . . . or prospective client . . . .

The relevant part of 17 C.F.R. sec. 4.41(a) contains nearly identical language and prohibits CTAs from advertising in a manner that violates sec. 6o(1). Both the statute and the regulation speak of defrauding "clients." CTS argues that the plain meaning of "client" is one who receives personalized advice within a fiduciary relationship or one on whose behalf a broker executes trades. Because CTS provides only impersonal advice and is not a broker, CTS claims that holding it liable under

sec. 6o or Regulation 4.41 would be contrary to the intent of Congress. Under the first step of Chevron, we must determine whether the word "client" as used in the statute is ambiguous./3 CTS provides a number of reasons as to why "client" unambiguously refers to only brokers or those who provide personalized advice, but none of these is convincing.

CTS first argues that the Supreme Court has held that "client" is limited to personalized relationships or to brokers in a similar statute. Lowe v. SEC, 472 U.S. 181 (1985) held that impersonal advisors are exempt from regulation under the Investment Advisers Act ("IAA"). The Court stated that two factors were "significant" in reaching its conclusion that the IAA applies only to those "who provide personalized advice attuned to a client's concerns." Id. at 207-08 & n.54, 210 n.57. First, the Court noted that the IAA "repeatedly refers to 'clients,' not 'subscribers.'" Id. at 208 n.54; see also id. at 201 n.45. Second, the SEC did not establish that Lowe and the other petitioners had "authority over the funds of subscribers," "been delegated decisionmaking authority to handle subscribers' portfolios or accounts," or "individualized, investment-related interactions" with their subscribers. Id. at 210 n.57. Also, the Court concluded by stating that Lowe and his corporations were presumptively not within the IAA as long as "the communications between petitioners and their subscribers remain entirely impersonal and do not develop into the kind of fiduciary, person-to-person relationships . . . that are characteristic of investment adviser-client relationships." Id. at 210.

However, at least two reasons exist for deciding that the word "client" in the CEA is not limited to personalized relationships or brokers. First, the CEA has a broader scope than the IAA. In Lowe, the Supreme Court held that impersonal advisors are excluded from the key definition of "investment adviser" ("IA") in the IAA because they fit within the exception for publishers. 15 U.S.C. sec. 80b-2(a)(11)(D); 472 U.S. at 206. While some persons are excluded from the definition of an IA only if their advice concerning securities is solely incidental to their other activities, the exceptions for publishers is not so

limited. 15 U.S.C. sec. 80b-2(a)(11).
Thus, bona fide publishers are not IAs
even if their entire business concerns
giving impersonal securities trading
advice. Moreover, because impersonal
advisors are excluded from the definition
of IAs, they are wholly exempt from the
IAA because the antifraud and other
provisions of that Act apply only to IAs.


   By contrast, the CEA exempts publishers
from the definition of CTA only if their
giving of advice concerning the
commodities markets is solely incidental
to their publishing business. 7 U.S.C.
sec. 1a(5). Impersonal publishers such as
CTS, whose commodities advising is
conceded to be more than solely
incidental to its publishing activities,
are included within the definition of
CTA, even though an analogous publisher
would be excluded from the definition of
IA. Because CTS is a CTA, all of the
provisions of the CEA regarding CTAs,
including sec. 6o and Regulation 4.41,
are applicable to CTS. If the antifraud
provisions did not apply to CTS because
the use of the word "client" limited
these provisions only to personalized
relationships, then CTS would be subject
to the CEA because of its status as a
CTA, but almost none of the CEA's
provisions would apply to it (the
significance of the one part of the
statute that appears to draw a
distinction between "subscribers" and
"clients" is addressed below). This
anomalous result casts doubt on CTS's
claim that "client" refers only to those
with whom an advisor has a personalized
relationship or for whom a person serves
as a broker.

   Second, in the CEA section that
announces congressional findings,
Congress states that CTAs' "advice,
counsel, publications, writings,
analyses, and reports . . . and
theircontracts, solicitations,
subscriptions, agreements, and other
arrangements with clients" are affected
with a national public interest. 7 U.S.C.
sec. 6l. The breadth of the language used
in this statement indicates that Congress
intended to include impersonal advisors
within the definition of CTA and intended
to subject such advisors to the antifraud
provisions of the CEA. In particular,
this section shows that "subscriptions"

are a kind of arrangement with "clients," indicating that even those who merely subscribe to impersonal publications are "clients" of a CTA. Admittedly, this section does not explicitly state that clients include those who receive impersonal advice, but its broad language brings the opposite assertion into question.

CTS's second claim is that the definition of "client" in everyday language includes only those with whom one has a personalized or fiduciary relationship. The CEA does not define client, so we assume that Congress intended the word to have its ordinary meaning. See, e.g., Williams v. Taylor, ___ U.S. ___, 120 S. Ct. 1479, 1488 (2000). The primary definition of "client" in modern dictionaries is a person who receives services or advice from a professional such as an attorney, indicating personalized advice. However, dictionaries also include "customer," which is one who simply purchases a product without any personalization, as a definition of "client." See Encarta World English Dictionary 340-41 (1999) ("CUSTOMER a person or organization to whom goods or services are provided and sold"); The American Heritage Dictionary 356 (3d. ed. 1992) ("A customer or patron: clients of the hotel"); 3 The Oxford English Dictionary 320 (2d. ed. 1989) ("a customer"); The Random House Dictionary 386 (2d. ed. 1987) ("a customer"); Webster's Third New International Dictionary (1981) ("PATRON, CUSTOMER") (all capitalization and italics in originals). "The existence of alternative dictionary definitions of" a word, "each making some sense under the statute, itself indicates that the statute is open to interpretation" and the word is ambiguous as between the two meanings. National R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 418 (1992); see also MCI Telecomms. Corp. v. AT & T Co., 512 U.S. 218, 226-27 (1994).

The use of both "client" and "subscriber" in one provision of the CEA, 7 U.S.C. sec. 6n(3)(A), and in some of the CFTC's regulations, 17 C.F.R. sec.sec. 4.33(a), 166.1(c), forms the basis of CTS's third contention. CTS claims that "subscriber" covers customers who receive only impersonal advice while

"client" means customers who receive personal advice. If "client" includes those who receive impersonal advice, then "subscriber" will be rendered mere surplusage in contravention of the interpretive canon that all words in a statute should, if possible, be given effect. See Dunn v. CFTC, 519 U.S. 465, 472 (1997); Bailey v. United States, 516 U.S. 137, 145-46 (1995). However, the surrounding context of the statute can overcome the presumption of a canon. See, e.g., Dewsnup v. Timm, 502 U.S. 410, 417 (1992). As described above, 7 U.S.C. sec. 6l indicates that subscriptions are a type of arrangement with clients for the purposes of the CEA and so "subscribers" are a type of "client." Thus, the statutory text implies that the word "subscriber" is subsumed by the word "client," which is sufficient to rebut the canon that each word or phrase in a statute should be given independent meaning. Therefore, the presumption against treating statutory terms as surplusage does not aid CTS.

CTS's fourth argument is that interpreting "client" to include impersonal advisors would lead to absurd results because the CFTC has interpreted the CEA's antifraud provisions to impose fiduciary duties. CTS posits examples such as parties on opposite sides of a commodities transaction each relying on CTS's products, in which case CTS would have violated its duty of loyalty to both parties. The CFTC agrees that the CEA imposes fiduciary obligations, but claims that the content of these duties varies depending on the type of CTA.

However, the CEA does not impose fiduciary duties on impersonal advisors. The leading authority for the proposition that the CEA imposes fiduciary obligations on all CTAs is Savage v. CFTC, 548 F.2d 192, 197 (7th Cir. 1977). However, Savage cannot be read so broadly; the party in that case offered personalized advice, id. at 194, and so would be considered a fiduciary under the common law. Nothing in sec. 6o indicates an intent on the part of Congress to impose fiduciary duties on impersonal advisors. Section 17(a) of the Securities Act of 1933, 15 U.S.C. sec. 77q(a), which contains language similar to 7 U.S.C. sec. 6o, does not impose fiduciary duties. See Trussell v. United

Underwriters, Ltd., 228 F. Supp. 757, 762 (D. Colo. 1964); see also SEC v. Maio, 51 F.3d 623, 631 (7th Cir. 1995) (holding that a breach of a fiduciary duty connected with trading on material nonpublic information is necessary for a violation of sec. 17(a), indicating that sec. 17(a) does not impose any independent fiduciary duties by its own language). Similarly, sec. 206 of the IAA, 15 U.S.C. sec. 80b-6, does not impose any new fiduciary duties, but only enforces already existing duties between clients and IAs. As the Supreme Court held in Lowe, the definition of IAs is limited to personalized advisors who have fiduciary relationships with their clients as a matter of common law. See SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963) ("Congress recognized the investment adviser to be" "a fiduciary."); id. at 201 ("The statute, in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested.") (emphasis added). An analogous interpretation applies to the CEA, which effectuates the extant fiduciary duties of personalized advisors and other agents but does not impose fiduciary obligations on impersonal advisors. See generally Hlavinka v. CFTC, 867 F.2d 1029, 1033 (7th Cir. 1989) (stating that a commodities advisor is not a fiduciary for purposes of the CEA where the customer makes his own independent trading decisions); CFTC v. Heritage Capital Advisory Servs., Ltd., 823 F.2d 171, 173 (7th Cir. 1987) (rejecting breach of fiduciary duty claim under the CEA because only brokers who operate discretionary accounts are fiduciaries). Section 6o does not permit the CFTC to impose fiduciary duties on impersonal CTAs such as CTS. Rather, these provisions permit the CFTC to bring proceedings against impersonal CTAs who commit fraud or engage in practices that operate as fraud and impose remedies to correct such violations. Thus, CTS's fear of being subjected to wide-ranging fiduciary duties is not a persuasive reason to decide that "client" unambiguously refers only to those who provide personal advice.

Fifth and finally, CTS claims that the antifraud provisions of the CEA raise serious constitutional questions and we should interpret the statute to avoid

such issues. See, e.g., Jones v. United States, 526 U.S. 227, 239-40 (1999). However, the parts of the CEA at issue do not present such grave questions that the constitutional avoidance canon should be employed. See Rust v. Sullivan, 500 U.S. 173, 191 (1991); see also Almendarez-Torres v. United States, 523 U.S. 224, 237-38 (1997) (stating that the avoidance canon must be applied judiciously in order to avoid distorting policy choices of elected representatives). CTS claims that constitutional questions led the Supreme Court in Lowe to hold that the IAA applies only to impersonal advisors. To the extent that constitutional concerns motivated the majority's opinion in Lowe, these were directed at the IAA's registration requirements. 472 U.S. at 210. Registration for impersonal advisors raises much more serious constitutional questions than antifraud provisions because registration operates as a form of prior restraint, which bears a strong presumption of unconstitutionality. See Schultz v. City of Cumberland, 228 F.3d 831, 851 (7th Cir. 2000). Because of the CFTC's recent regulation exempting imper sonal advisors from registration under the CEA, 17 C.F.R. sec. 4.14(a)(9), the constitutional issues that concerned the Supreme Court in Lowe are not present in the instant case. We find that the antifraud provisions alone, detached from the registration requirement, do not raise the grave constitutional concerns that would require this court to determine that "client" unambiguously refers to only those receiving personalized advice. See R&W Technical Servs. Ltd. v. CFTC, 205 F.3d 165, 175-76 (5th Cir. 2000).

None of CTS's contentions demonstrates that the word "client" as used in the CEA unambiguously means only those who receive personalized advice. Instead, the definition of "client" is uncertain because it can refer to merely those who receive tailored advice from professionals or those who receive any kind of service regardless of whether it is personalized. Thus, the first step of Chevron is satisfied in favor of the CFTC and we proceed to the second step: determining whether the agency's interpretation is reasonable. CTS does not make any arguments on this point, and we find no reason to conclude that the CFTC's construction is unreasonable. 7 U.S.C. sec. 6l indicates that Congress

intended for the CEA to have a broad reach, and the CFTC appears to be effectuating that purpose. Thus, we defer to the CFTC's interpretation of "client" in applying the CEA and conclude that sec. 6o and Regulation 4.41 can be applied to CTS.

## 2. sec. 6b.

The relevant part of 7 U.S.C. sec. 6b(a) states that:

It shall be unlawful . . . (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for . . . (B) determining the price basis of any transaction in interstate commerce in such commodity . . . --[to commit fraud, willful deception, or certain manipulative acts].

CTS claims that the "for or on behalf of" language relates back to "any person." According to CTS, sec. 6b only applies to people who make contracts "for or on behalf of" other people, that is, brokers and other agents. The CFTC claims that this key phrase relates back to "any contract," and thus any person, not just a broker, who commits fraud in connection with a contract made for another person has violated sec. 6b./4

CTS is correct regarding the meaning of sec. 6b. The CFTC's reading would render the "for or on behalf of" language mere surplusage. According to the CFTC, this phrase only specifies that the contract must be made on behalf of someone other than the party committing fraud. Since a person cannot defraud him or herself through contract or otherwise, Congress could have omitted "for or on behalf of" and the statute would have the exact same meaning as the CFTC now proposes. Thus, the CFTC's construction contravenes the aforementioned canon that each word or phrase in a statute should be given effect if possible. See Dunn, 519 U.S. at 472. Unlike in the above discussion of sec. 6n(3)(A), where the CFTC pointed to sec. 6l as indicating that a subscriber is a type of client, the CFTC does not provide any evidence that Congress intended "for or on behalf of" to be

subsumed by some other part of sec. 6b(a). Thus, "for or on behalf" unambiguously refers to "any person," and therefore the provision applies only to brokers or others who have an agency relationship with their clients./5 Because CTS does not have such a relationship with its customers, sec. 6b cannot be applied to CTS.

C. Constitutionality

Because sec. 6o and Regulation 4.41 as reasonably construed by the CFTC apply to CTS's activities, we must consider CTS's constitutional claims. CTS contends that sec. 6o and Regulation 4.41 cannot be applied to an impersonal speaker on a public topic, such as the commodities markets, consistent with the First Amendment because parts of these provisions lack a scienter requirement. CTS also objects on constitutional grounds to any attempt by the CFTC to force CTS to make affirmative disclosures, claiming that this compelled speech violates CTS's First Amendment rights. We first examine whether the antifraud provisions can be used to punish CTS for speaking, and then consider whether CTS can be forced to speak.

1. Restricted speech.

a) Overview of fraud and the First Amendment.

The case law regarding fraudulent speech and the First Amendment establishes a number of general principles which guide this court's inquiry. Laws directly punishing fraudulent speech survive constitutional scrutiny even where applied to pure, fully protected speech. See McIntyre v. Ohio Elections Com'n, 514 U.S. 334, 357 (1995); Riley v. National Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 795, 800 (1988); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 637 (1980); Schneider v. State, 308 U.S. 147, 164 (1939); CFTC v. Vartuli, 228 F.3d 94, 110 (2d Cir. 2000); R&W Technical Servs., 205 F.3d at 175. Fraud is normally defined as requiring that the speaker act with scienter. See Capital Gains, 375 U.S. 180, 192 (1963); Black's Law Dictionary 670-71 (7th ed. 1999). The government is not limited only to explicit antifraud measures to prevent its citizens from

being defrauded; certain other narrowly tailored measures with a direct relationship to preventing fraud may be used as well. See McIntyre, 514 U.S. 334, 349-51, 353; Riley, 487 U.S. at 795, 800; Village of Schaumburg, 444 U.S. at 637-38. However, the government cannot overreach in its attempts to protect the public from fraud. Laws that primarily prohibit fully protected speech along with potentially fraudulent speech often violate the First Amendment, even if the law's stated purpose is to prevent fraud; instead, more precise measures must be used. See McIntyre, 514 U.S. at 343-44, 350-51, 357; Riley, 487 U.S. at 795; Village of Schaumburg, 444 U.S. at 637. Likewise, the government cannot label certain speech as fraudulent so as to deprive it of First Amendment protection. See Riley, 487 U.S. at 794 n.8; Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 966-67 (1984); Village of Schaumburg, 444 U.S. at 637.

Commensurate with its subordinate position within the First Amendment hierarchy, advertising receives less pro tection from regulation than fully protected speech. Misleading or deceptive advertising may be prohibited in addition to fraudulent commercial speech. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 623-24 (1995); Edenfield v. Fane, 507 U.S. 761, 768 (1993); Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72 (1976). Statutes that prohibit truthful and nonmisleading commercial speech in addition to fraudulent or deceptive speech survive constitutional scrutiny if the restriction is narrowly drawn and directly and materially advances a substantial state interest. See Went For It, 515 U.S. at 624; Edenfield, 507 U.S. at 768-69.

b) The CEA provision and the CFTC's regulation.

To understand CTS's challenge, a distinction between the two parts contained in both sec. 6o(1) and Regulation 4.41(a) must be recognized. The first part of each of the CEA provision and CFTC regulation prohibit a CTA from employing "any device, scheme, or artifice to defraud." 7 U.S.C. sec. 6o(1) (A); 17 C.F.R. sec. 4.41(a)(1).

This language requires that a CTA act with scienter before being punished for violating the statute. See Aaron v. SEC, 446 U.S. 680, 696 (1980); Messer v. E.F. Hutton & Co., 847 F.2d 673, 677-78 (11th Cir. 1988)./6 The second part of each law punishes "any transaction, practice, or course of business which operates as a fraud or deceit." 7 U.S.C. sec. 6o(1)(B); 17 C.F.R. sec. 4.41(a) (2). This language focuses upon the effect a CTA's conduct has on its investing customers rather than the CTA's culpability, and so does not require a showing of scienter. See Aaron, 446 U.S. at 696-97; Messer, 847 F.2d at 679. CTS argues that any impersonal, public speech about a topic of public interest cannot be punished by the government absent a showing of scienter. Because certain parts of the CEA do not have such a requirement, CTS asserts that applying these provisions to it would be unconstitutional.

Applying the principles elaborated in the previous section to the CEA antifraud laws, we hold that all of the provisions challenged by CTS pass constitutional muster. Section 6o(1)(A) and Regulation 4.41(a)(1) require scienter and do no more than prohibit common law fraud in commodities transactions. Explicit antifraud measures such as these do not violate the First Amendment. While the remaining two provisions do not require scienter, both are of limited scope. Each prohibits only certain activities that deceive or defraud a CTA's customers, Messer, 847 F.2d at 679-80, and a showing of negligence is required, see SEC v. Hughes Capital Corp., 124 F.3d 449, 454 (3d Cir. 1997). Section 4.41(a)(2) is constitutional because it applies only to advertising, which is to say commercial speech./7 The government can directly regulate deceptive advertising without any further justification. Section 6o(1)(B) is constitutional because it is a narrowly tailored measure that is directly related to preventing fraud in statements that purport to convey factual information. The provision is narrow because it targets only a certain group of deceptive activities and requires negligence, and is directly related to fraud because it punishes only a limited group of activities that deceive or defraud a CTA's customers or potential customers.

On the limited record before us, we must assume that the CFTC intends to regulate CTS only within the limits prescribed by these provisions. If the CFTC were to apply these laws more broadly to restrict protected speech that cannot be shown to be fraudulent as a matter of fact, then a different case would be presented. In particular, if the CFTC were to attempt to punish statements that are more a matter of opinion or belief, rather than statements that could be empirically shown to be false or deceptive, then more serious constitutional issues would exist. Cf. Riley, 487 U.S. at 803 (Scalia, J., concurring) ("It is axiomatic that, although fraudulent misrepresentations of facts can be regulated, the dissemination of ideas cannot be regulated to prevent it from being unfair or unreasonable.") (citations omitted); Argello v. City of Lincoln, 143 F.3d 1152 (8th Cir. 1998) (holding that city's interest in preventing fraud could not justify municipal ordinance against fortune-telling).

2. Compelled speech.

CTS seeks to prevent the CFTC from imposing any affirmative disclosure obligations on its publications. The judicial tests for compelled speech, as elaborated below, require that a court know the specific reason why the disclosure was required and the content of the disclosure. Because we have neither of these facts, we hold that CTS's challenges are unripe. We divide the discussion between commercial speech and non-commercial speech.

The government can impose affirmative disclosures in commercial advertising if these are reasonably related to preventing the public from being deceived or misled. See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651 (1985); Vartuli, 228 F.3d at 108. Such a disclosure must be no broader than necessary to prevent the deceptive or misleading advertising engaged in by the party. See Encyclopaedia Britannica, Inc. v. FTC, 605 F.2d 964, 972 (7th Cir. 1979); Porter & Dietsch, Inc. v. FTC, 605 F.2d 294, 307 (7th Cir. 1979); National Comm'n on Egg Nutrition v. FTC, 570 F.2d 157, 164 (7th Cir. 1977). This inquiry is

inherently fact-intensive because a court must examine the particular speech that the government claims deceives or misleads the public and determine whether the specific affirmative disclosure remedy imposed is no broader than necessary to cure this problem. In the instant case, we do not know what statements of CTS's that the CFTC has found to be deceiving or misleading or why. Nor do we know the language of the affirmative disclosure that the CFTC may impose on CTS's advertisements. Because of the absence of these crucial facts, CTS's challenge to any affirmative disclosures in its commercial advertising are not fit for judicial decision and are thus unripe.

Regarding CTS's fully protected speech, the government's power to compel speech is "constitutional[ly] equivalen[t]" to its power to silence speech. See Riley, 487 U.S. at 797. As explained above, narrowly drawn laws that have a direct relationship to preventing fraud about factual matters do not violate the First Amendment. Concomitantly, narrowly drawn affirmative disclosures that directly cure fraudulent speech are constitutionally permissible. As with commercial speech, affirmative disclosures required in more protected forms of speech must also be no broader than necessary. We do not have sufficient facts to apply these principles to any potential affirmative disclosures that may be required of CTS by the CFTC because of the same lack of factual development described above.

III.  Conclusion

CTS's statutory challenge and some of its constitutional claims are ripe for judicial resolution. Section 6o and Regulation 4.41 apply to CTS because of Chevron deference. Section 6b is limited by its own language to agency relationships and thus does not encompass impersonal advisors such as CTS. The CEA provisions either prohibit fraud, regulate misleading commercial advertising, or are narrowly drawn and have a direct relationship to preventing fraud, and thus are constitutional. Further factual development is necessary before we can determine whether affirmative disclosure requirements by the CFTC would violate the First

Amendment. This decision moots CTS's request for a temporary injunction. The district court's decisions granting partial summary judgment against CTS and enforcing in part the CFTC's subpoenas are Affirmed.

/1 The CFTC originally appealed the district court's decision that the registration requirements of sec. 6m are unconstitutional as applied to CTS, but voluntarily dismissed that appeal. The CFTC has recently adopted a rule exempting from registration CTAs that do not direct client accounts and provide only impersonal trading advice. 17 C.F.R. sec. 4.14(a)(9).

/2 Both parties focus on FTC v. Miller, 549 F.2d 452, 460-61 (1977), which appears to include a broad exception to the normal rule that judicial review of a party's legal challenges in a subpoena enforcement proceeding are limited. Because the extreme burden exception applies to CTS, we need not determine whether and how subsequent decisions have limited Miller.

/3 Neither CTS nor the CFTC rely on the legislative history of the CEA as a means of determining Congress's intent. Thus, the only evidence we use to determine whether Congress intended for the antifraud provisions to apply only to personalized advisors or brokers is the statutory language.

/4 The CFTC also directs this court's attention to a number of cases that have given a broad interpretation to the "in or in connection with" language in the statute, such as Hirk v. Agri-Research Council, Inc., 561 F.2d 96, 103-04 (7th Cir. 1977). Such cases do not address the "for or on behalf of" phrase and thus provide minimal aid in resolving the specific issue raised by CTS.

/5 In addition, we note that the CFTC has interpreted sec. 6b to apply only to agency relationships. See Hammond v. Smith Barney, Harris Upham & Co., [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 24,617 at 36,658 n.16 (CFTC 1990) ("Section 4b(A) of the Act only applies where there is an agency-like relationship between the damaged party and the wrongdoer (i.e., when the wrongdoer is acting "for or on behalf of [the] other person,) . . .").

/6 While Aaron interpreted Section 17(a) of the Securities Act of 1933, 15 U.S.C. sec. 77q(a), this statute contains language almost identical

to the commodity laws in question. Thus, like the Eleventh Circuit in Messer, we rely on judicial interpretations of Section 17(a) in interpreting 7 U.S.C. sec. 6o(1).

/7 CTS alleges that its advertisements contain both commercial and non-commercial speech. Assuming this is true, the analysis is not seriously affected. Commercial speech is separable from other kinds of speech, and the CFTC must apply the appropriate standard to the speech on which it seeks to hang CTS's liability. See City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 n.21 (1993); Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 474–75 (1989).